**LEOPOLD & ASSOCIATES, PLLC**
BY: Matthew Siti, Esquire (Atty. I.D.# 129032014)
80 Business Park Drive, Suite 110
Armonk, NY 10504
Tel: (914) 219-5787
Attorneys for Rushmore Loan Management Services, LLC in its capacity as servicer for MTGLQ
Investors, LP

<div align="center">

UNITED STATES BANKRUPTCY COURT
DISTRICT OF NEW JERSEY
**Camden Vicinage**

</div>

| | |
|---|---|
| IN RE: Claire E. Fisher | Case No.: 18-28576-JNP |
| Debtor | Chapter: 13 |
| | Hearing Date: November 19, 2019 at 10:00 a.m. |
| | Judge: Jerrold N. Poslusny Jr. |
| | NOTICE OF MOTION FOR RELIEF FROM THE AUTOMATIC STAY |

TO:
**Debtor (Via Mail)**
Claire E. Fisher
1170 Lewis Terrace
West Deptford, NJ 08096

**Debtor's Attorney (Via ECF)**
Jill Marie Tribulas, Esq.
1026 Haddon Avenue
Collingswood, NJ 08108

**Trustee (Via ECF)**
Isabel C. Balboa
535 Route 38, Suite 580
Cherry Hill, NJ 08002

**U. S. Trustee (Via ECF)**
U.S. Dept. of Justice
One Newark Center, Suite 200
Newark, NJ 07102

DEAR SIRS AND MADAMS:

PLEASE TAKE NOTICE that on **November 19, 2019 at 10:00 a.m.,** or as soon as counsel

may be heard, the undersigned attorney for the secured creditor, **Rushmore Loan Management Services, LLC in their capacity as servicer for MTGLQ Investors, LP,** will move before the United States Bankruptcy Court, District of New Jersey, for an Order Vacating the Automatic Stay with respect to property known as 1170 Lewis Terrace, West Deptford TWP, NJ 08096, to commence or continue its foreclosure action, by reason of the failure of the Debtor to make regular monthly mortgage payments outside his/her Chapter 13 Plan.

PLEASE TAKE FURTHER NOTICE that if you wish to contest this motion, you must file a written response with the Clerk of the Bankruptcy Court and serve a copy of the responding papers upon the undersigned at least seven (7) days before the date of the hearing.

PLEASE TAKE FURTHER NOTICE that the moving party avers that no brief is necessary as the matter does not involve complex legal issues.

PLEASE TAKE FURTHER NOTICE that the undersigned hereby waives oral argument and relies upon the Certifications in support of this motion unless the matter is contested.

Date: October 21, 2019

LEOPOLD & ASSOCIATES, PLLC

By: /s/ Matthew Siti
Matthew Siti, Esq.

**LEOPOLD & ASSOCIATES, PLLC**
BY: Matthew Siti, Esquire (Atty. I.D.# 129032014)
80 Business Park Drive, Suite 110
Armonk, NY 10504
Tel: (914) 219-5787
Attorneys for Secured Creditor

| | |
|---|---|
| IN re:<br><br>Claire E. Fisher<br><br>        Debtor | Case No.: 18-28576-JNP<br><br>Chapter: 13<br><br>Hearing Date: November 19, 2019 at 10:00 a.m.<br><br>Judge: Jerrold N. Poslusny Jr. |

## CERTIFICATION OF COUNSEL IN SUPPORT OF MOTION FOR RELIEF FROM AUTOMATIC STAY PURSUANT TO 11. U.S.C. §362

The undersigned, attorney for Movant, Rushmore Loan Management Services, LLC in its capacity as servicer for MTGLQ Investors, LP, does hereby certify:

1.      I am an attorney at law of the State of New Jersey and an associate with the law firm of Leopold & Associates, PLLC.

2.      Movant is Rushmore Loan Management Services, LLC in its capacity as servicer for MTGLQ Investors, LP.

3.      Debtor is the owner of premises, hereinafter known as the mortgaged premises, located at: 1170 Lewis Terrace, West Deptford Twp, NJ 08096.

4.      Debtor filed the instant Chapter 13 case on September 18, 2018.

5.      Movant is the holder of a mortgage, which is a first lien on the mortgaged premises. A copy of said mortgage is attached hereto.

6.      Movant has instituted or wishes to institute foreclosure proceedings on the mortgage because of Debtor's failure to make the monthly payments required thereunder.

7.     The foreclosure proceedings filed or to be instituted were stayed by the filing of the instant Chapter 13 Petition.

8.     Debtor has failed to make payments to discharge the arrearages on said mortgage and/or has failed to make the current monthly payments on said mortgage since the filing of the Chapter 13 Petition.  Such defaults include failure to make payments as shown in the Certification of Post-Petition Payment History submitted herewith.

9.     Movant is entitled to relief from the automatic stay Section 362(A) of the code because of the foregoing default and because (a) adequate protection of the interest of Movant is lacking; and (b) Debtor has inconsequential or no equity in the premises, which is not necessary to an effective reorganization or plan.

10.    Movant requests relief from the stay for cause to allow Movant to proceed with its state law remedies up to and including eviction proceedings.

11.    Upon execution and entry of the Order granting the relief requested, the requirements specified in both (1) Fed. R. Bankr. P. 3002.1 (b) regarding Notice of Mortgage Payment Changes and (2) Fed. R. Bankr. P. 3002.1 (c) regarding Notice of Post-petition Mortgage Fees, Expenses and Charges are hereby waived, or made inapplicable, during the pendency of the within bankruptcy case.

12.    I hereby certify that the foregoing statements made by me are true.  I am aware that if any of the foregoing statements made by me are willfully false, I am subject to punishment.

Date: October 21, 2019

LEOPOLD & ASSOCIATES, PLLC

By: /s/ Matthew Siti
Matthew Siti, Esquire

UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF NEW JERSEY
**Caption in Compliance with D.N.J. LBR 9004-2(c)**

**LEOPOLD & ASSOCIATES, PLLC**
BY: Matthew Siti, Esquire (Atty. I.D.# 129032014)
80 Business Park Drive, Suite 110
Armonk, NY 10504
Tel: (914) 219-5787
Attorneys for Secured Creditor

IN re:                                      Case No.: 18-28576-JNP

Claire E. Fisher                            Chapter: 13

      Debtor                           Hearing Date: November 19, 2019 at 10:00
                                            a.m.

                                            Judge: Jerrold N. Poslusny Jr.

## CERTIFICATION RE: POST-PETITION PAYMENT HISTORY
## (NOTE AND MORTGAGE DATED March 25, 2004)

_Mele Uasi_ , employed as _Bankruptcy Specialist_ by
_Rushmore Loan Management Srvcs_ , hereby certifies the following:

Recorded on **April 19, 2004**, in **Gloucester** County, in Book **7519** at Page **35**

Property Address: **1170 Lewis Terrace, West Deptford Twp, NJ 08096**

Mortgage Holder: **Rushmore Loan Management Services, LLC in its capacity as servicer for**

**MTGLQ Investors, LP.**

Mortgagor(s)/ Debtor(s): **Claire E. Fisher and Robert E. Fisher**

POST-PETITION PAYMENTS (Petition filed on September 18, 2018)

| Amount Due | Date Payment Was Due | How Payment Was Applied (Mo./Yr.) | Amount Received | Date Payment Received | Check or Money Order Number |
|---|---|---|---|---|---|
| 1. $572.47 | 12/01/2018 | | 00.00 | | |
| 2. $572.47 | 01/01/2019 | | 00.00 | | |
| 3. $572.47 | 02/01/2019 | | 00.00 | | |
| 4. $572.47 | 03/01/2019 | | 00.00 | | |

| | | | | | |
|---|---|---|---|---|---|
| 5.  $572.47 | 04/01/2019 | | 00.00 | | |
| 6.  $572.47 | 05/01/2019 | | 00.00 | | |
| 7.  $572.47 | 06/01/2019 | | 00.00 | | |
| 8.  $572.47 | 07/01/2019 | | 00.00 | | |
| 9.  $572.47 | 08/01/2019 | | 00.00 | | |
| 10. $572.47 | 09/01/2019 | | 00.00 | | |
| 11. $572.47 | 10/01/2019 | | 00.00 | | |
| TOTAL: $6,297.17 | | | | | |

Monthly payments past due: 11 mos. x $572.47

(Monthly payment + escrow) = $ 572.47 as of September 03, 2019.

Each current monthly payment is comprised of:

Principal and Interest $478.83

R.E. Taxes: $ 0.00

Insurance: $93.64

Late Charge: $ 0.00

Other: _____ (Specify: _____ )

**TOTAL $572.47**

If the monthly payment has changed during the pendency of the case, please explain (attach separate sheet(s) if necessary):

Pre-petition arrears: June 01, 2017 to September 18, 2018 **Total= $16,782.60**

I certify under penalty of perjury that the above is true.

Date: _10/22/19_

_____
Signature

**LEOPOLD & ASSOCIATES, PLLC**
BY: Matthew Siti, Esquire (Atty. I.D.# 129032014)
80 Business Park Drive, Suite 110
Armonk, NY 10504
Tel: (914) 219-5787
Attorneys for Rushmore Loan Management Services, LLC in its capacity as servicer for MTGLQ
Investors, LP

<div align="center">

UNITED STATES BANKRUPTCY COURT
DISTRICT OF NEW JERSEY
**Camden Vicinage**

</div>

| | |
|---|---|
| IN RE | Case No.: 18-28576-JNP |
| Claire E. Fisher | Chapter: 13 |
| Debtor | Hearing Date: November 19, 2019 at 10:00 a.m. |
| | Judge: Jerrold N. Poslusny Jr. |
| | CERTIFICATION IN SUPPORT OF MOTION FOR RELIEF FROM THE AUTOMATIC STAY |

I, _Mele Uasi_ , do hereby certify that:

1.  I am a _Bankruptcy Specialist_ at _____ and I have complete knowledge of the amount due on the within obligation and mortgage and I am authorized to make this certification.

2.  **Rushmore Loan Management Services in its capacity as servicer for MTGLQ Investors, LP** is the holder of a mortgage on real property owned by the Debtor and located at 1170 Lewis Terrace, West Deptford, NJ 08096 ("Premises"), recorded in Gloucester County.

3.  The mortgage executed by the Debtor grants the Movant a lien on the Premises.

4.  The Debtor has defaulted upon the note and mortgage as to post-petition payments.

5.   Movant has not received payments on the Note and it lacks adequate protection of its interest in the property post-petition for the months of December, 2018 to October, 2019.

6.   Since the filing of the Petition, Movant has incurred attorney's fees in connection with this Motion.

7.   The amount of the Debtor's monthly payment and the total post-petition arrears due and owing are provided on the attached Certification regarding the Post-Petition Payment History.

8.   This certification is made in support of the Motion for Relief from the Automatic Stay so that Movant, Rushmore Loan Management Services, LLC in its capacity as servicer for MTGLQ Investors, LP, may exercise all its rights under the applicable non-bankruptcy law and to move to protect its rights under the mortgage contract.

9.   I hereby certify that the foregoing statements made by me are true. I am aware that if any of the foregoing statements made by me are willfully false, I am subject to punishment.

Date:   _10/22/19_

Name: _Mele Uasi_
Title: _Bankruptcy Specialist_

| UNITED STATES BANKRUPTCY COURT FOR THE DISTRICT OF NEW JERSEY **Caption in Compliance with D.N.J. LBR 9004-2(c)** | |
|---|---|
| **LEOPOLD & ASSOCIATES, PLLC** BY: Matthew Siti, Esquire (Atty. I.D.# 129032014) 80 Business Park Drive, Suite 110 Armonk, NY 10504 Tel: (914) 219-5787 Attorneys for Secured Creditor | |
| IN re: | Case No.: 18-28576-JNP |
| Claire E. Fisher | Chapter: 13 |
| Debtor | Hearing Date: November 19, 2019 at 10:00 a.m. |
| | Judge: Jerrold N. Poslusny Jr. |

## ORDER VACATING STAY

The relief set forth on the following pages, number two (2) through two (2) is hereby

**ORDERED**

Upon the motion of **Rushmore Loan Management Services, LLC in its capacity as servicer for MTGLQ Investors, LP**, or its successors or assignees, under Bankruptcy Code section 362(a) for relief from the automatic stay as to certain property as hereinafter set forth, and for cause shown, it is

ORDERED that the automatic stay is vacated to permit the movant to institute or resume and prosecute to conclusion one or more actions in the court(s) or appropriate jurisdiction to pursue the movant's rights in the following:

☒      Real property more fully described as:

        1170 Lewis Terrace, West Deptford, NJ 08096

☐      Personal property more fully described as:

It is further ORDERED that the movant may join the debtor and any trustee appointed in this case as defendants in its action(s) irrespective of any conversion to any other chapter of the Bankruptcy Code.

The Movant shall serve this Order on the Debtor, any Trustee and any other party who entered an appearance on the motion.

| UNITED STATES BANKRUPTCY COURT DISTRICT OF NEW JERSEY | |
|---|---|
| **Caption in Compliance with D.N.J. LBR 9004-2(c)** | |
| Matthew Siti, Esquire (Atty. I.D.# 129032014) Leopold & Associates, PLLC 80 Business Park Drive, Suite 110 Armonk, NY 10504 Tel: (914) 219-5787 Attorneys for Secured Creditor | |
| In Re: Claire E. Fisher Debtor | Case No.: 18-28576-JNP Chapter: 13 Hearing Date: November 19, 2019 at 10:00 a.m. Judge: Jerrold N. Poslusny Jr |

## CERTIFICATION OF SERVICE

1.  I, <u>Gladis Villafuerte</u> :

    ☐ represent the _____ in the above-captioned matter.

    ☒ am the secretary/paralegal for <u>Matthew Siti, Esq.</u>, who represents the <u>Movant</u> in the above captioned matter.

    ☐ am the _____ in the above case and am representing myself.

2.  On <u>October 23, 2019,</u> I sent a copy of the following pleadings and/or documents to the parties listed in the chart below:

    - Notice of Motion for Relief of Automatic Stay
    - Certifications in support of Motion for Relief from Automatic Stay
    - Proposed Order
    - Certification of Service

3.  I hereby certify under penalty of perjury that the above documents were sent using the mode of service indicated.

Dated: <u>October 21, 2019</u>

<u>/s/</u>Gladis Villafuerte
Signature

| Name and Address of Party Served | Relationship of Party to the Case | Mode of Service |
|---|---|---|
| Claire E. Fisher<br>1170 Lewis Terrace<br>West Deptford, NJ 08096 | Debtor | ☐ Hand-delivered<br>☒ Regular mail<br>☐ Certified mail/RR<br>☐ E-mail<br>☐ Notice of Electronic Filing (NEF)<br>☐ Other _____<br>(as authorized by the court *) |
| Jill Marie Tribulas<br>Law Office of Jill M. Tribulas, LLC<br>1026 Haddon Avenue<br>Collingswood, NJ 08108 | Attorney for Debtor | ☐ Hand-delivered<br>☐ Regular mail<br>☐ Certified mail/RR<br>☐ E-mail<br>☒ Notice of Electronic Filing (NEF)<br>☐ Other _____<br>(as authorized by the court *) |
| Isabel C. Balboa<br>Chapter 13 Standing Trustee<br>Cherry Tree Corporate Center<br>535 Route 38, Suite 580<br>Cherry Hill, NJ 08002 | Chapter 13 Trustee | ☐ Hand-delivered<br>☐ Regular mail<br>☐ Certified mail/RR<br>☐ E-mail<br>☒ Notice of Electronic Filing (NEF)<br>☐ Other _____<br>(as authorized by the court *) |
| U.S. Trustee<br>US Dept of Justice<br>Office of the US Trustee<br>One Newark Center Ste 2100<br>Newark, NJ 07102 | U.S. Trustee | ☐ Hand-delivered<br>☐ Regular mail<br>☐ Certified mail/RR<br>☐ E-mail<br>☒ Notice of Electronic Filing (NEF)<br>☐ Other _____<br>(as authorized by the court *) |

\* May account for service by fax or other means as authorized by the court through the issuance of an Order Shortening Time.

969

# ADJUSTABLE RATE NOTE
(LIBOR Index-Rate Caps)

THIS NOTE CONTAINS PROVISIONS ALLOWING FOR CHANGES IN MY INTEREST RATE AND MY MONTHLY PAYMENT. THIS NOTE LIMITS THE AMOUNT MY INTEREST RATE CAN CHANGE AT ANY ONE TIME AND THE MAXIMUM RATE I MUST PAY.

March 25, 2004                                                                          Date
CHERRY HILL, NJ                                                                    City, State
1170 Lewis Ter, West Deptford Twp, New Jersey  08096          Property Address

## 1. BORROWER'S PROMISE TO PAY

In return for a loan I have received, I promise to pay U.S. $ 132,000.00
One Hundred Thirty-Two Thousand and 00/100ths
(this amount is called "Principal"), plus interest, to the order of the Lender. The Lender is
Chase Manhattan Mortgage Corp.

a corporation organized and existing under the laws of New Jersey

I will make all payments under this Note in the form of cash, check or money order. I understand that the Lender may transfer this Note. The Lender or anyone who takes this Note by transfer and who is entitled to receive payments under this Note is called the "Note Holder."

## 2. INTEREST

Interest will be charged on unpaid principal until the full amount of Principal has been paid. I will pay interest at a yearly rate of Six and 875/1000
6.875                                                                                                              %.

The interest rate I will pay will change in accordance with Section 4 of this Note.

The interest rate required by this Section 2 and Section 4 of this Note is the rate I will pay both before and after any default described in Section 7(B) of this Note.

## 3. PAYMENTS

(A) Time and Place of Payments

I will pay principal and interest by making payments every month.

I will make my monthly payments on the 1ST   day of each month beginning on May 1, 2004
. I will make these payments every month until I have paid all of the principal and interest and any other charges described below that I may owe under this Note. Each monthly payment will be applied as of its scheduled due date and will be applied to interest before Principal. If, on April 1, 2034        , I still owe amounts under this Note, I will pay those amounts in full on that date, which is called the "Maturity Date."

I will make my monthly payments at 20955 Pathfinder Road, Ste 300
Diamond Bar RPC, California  91765
or at a different place if required by the Note Holder.

(B) Amount of My Initial Monthly Payment

Each of my initial monthly payments will be in the amount of U.S. $ 867.15
Eight Hundred Sixty-Seven and 15/100ths
This amount may change.

(C) Monthly Payment Changes

Changes in my monthly payment will reflect changes in the unpaid principal of my loan and in the interest rate that I must pay. The Note Holder will determine my new interest rate and the changed amount of my monthly payment in accordance with Section 4 of this Note.

## 4. INTEREST RATE AND MONTHLY PAYMENT CHANGES

(A) Change Dates

The interest rate I will pay may change on the 1ST      day of April, 2006
and on that day every sixth month thereafter. Each date on which my interest rate could change is called a "Change Date."

(B) The Index

Beginning with the first Change Date, my interest rate will be based on an Index. The "Index" is the average of interbank offered rates for six month U.S. dollar-denominated deposits in the London market ("LIBOR"), as published in The Wall Street Journal. The most recent Index figure available as of the date 45 days before each Change Date is called the "Current Index."

If the Index is no longer available, the Note Holder will choose a new index which is based upon comparable information. The Note Holder will give me notice of this choice.

**(C) Calculation of Changes**

Before each Change Date, the Note Holder will calculate my new interest rate by adding
**Three and 500/1000**
percentage points (3.500            %) to the Current Index. The Note Holder will then round the result of this addition to the nearest one-eighth of one percentage point (0.125%). Subject to the limits stated in Section 4(D) below, this rounded amount will be my new interest rate until the next Change Date.

The Note Holder will then determine the amount of the monthly payment that would be sufficient to repay the unpaid principal that I am expected to owe at the Change Date in full on the Maturity Date at my new interest rate in substantially equal payments. The result of this calculation will be the new amount of my monthly payment.

**(D) Limits on Interest Rate Changes**

The interest rate I am required to pay at the first Change Date will not be greater than **Nine and 875/1000**
**9.875**                                             %.

or less than **Six and 875/1000**
**6.875**                                             %.

Thereafter, my interest rate will never be increased or decreased on any single Change Date by more than one and a half percentage points (1.5%) from the rate of interest I have been paying for the preceding six months. My interest rate will never be greater than

**13.875**                                             %.

and will never be lower than **Six and 875/1000**
**6.875**                                             %.

**(E) Effective Date of Changes**

My new interest rate will become effective on each Change Date. I will pay the amount of my new monthly payment beginning on the first monthly payment date after the Change Date until the amount of my monthly payment changes again.

**(F) Notice of Changes**

The Note Holder will deliver or mail to me a notice of any changes in my interest rate and the amount of my monthly payment before the effective date of any change. The Notice will include information required by law to be given me and also the title and telephone number of a person who will answer any question I may have regarding the notice.

**5. BORROWER'S RIGHT TO PREPAY**

I have the right to make payments of Principal at any time before they are due. A payment of Principal only is known as a "Prepayment." When I make a Prepayment, I will tell the Note Holder in writing that I am doing so. I may not designate a payment as a Prepayment if I have not made all the monthly payments due under the Note.

I may make a full Prepayment or partial Prepayments without paying any Prepayment charge. The Note Holder will use all of my Prepayments to reduce the amount of Principal that I owe under this Note. However, the Note Holder may apply my Prepayment to the accrued and unpaid interest on the Prepayment amount before applying my Prepayment to reduce the Principal amount of the Note. If I make a partial Prepayment, there will be no changes in the due dates of my monthly payments unless the Note Holder agrees in writing to those changes. My partial Prepayment may reduce the amount of my monthly payments after the first Change Date following my partial Prepayment. However, any reduction due to my partial Prepayment may be offset by an interest rate increase.

**6. LOAN CHARGES**

If a law, which applies to this loan and which sets maximum loan charges, is finally interpreted so that the interest or other loan charges collected or to be collected in connection with this loan exceed permitted limits, then: (a) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already collected from me which exceeded permitted limits will be refunded to me. The Note Holder may choose to make this refund by reducing the Principal I owe under this Note or by making a direct payment to me. If a refund reduces Principal, the reduction will be treated as a partial Prepayment.

**7. BORROWER'S FAILURE TO PAY AS REQUIRED**

**(A) Late Charges for Overdue Payments**

If the Note Holder has not received the full amount of any monthly payment by the end of fifteen (15) calendar days after the date it is due, I will pay a late charge to the Note Holder. The amount of the charge will be **5.000**
**Percent**                                      of my overdue payment of principal and interest. I will pay this late charge promptly but only once on each late payment.

**(B) Default**

If I do not pay the full amount of each monthly payment on the date it is due, I will be in default.

**(C) Notice of Default**

If I am in default, the Note Holder may send me a written notice telling me that if I do not pay the overdue amount by a certain date, the Note Holder may require me to pay immediately the full amount of Principal which has not been paid and all the interest that I owe on that amount. That date must be at least 30 days after the date on which the notice is mailed to me or delivered by other means.

**(D) No Waiver By Note Holder**

Even if, at a time when I am in default, the Note Holder does not require me to pay immediately in full as described above, the Note Holder will still have the right to so do if I am in default at a later time.

**(E) Payment of Note Holder's Costs and Expenses**

If the Note Holder has required me to pay immediately in full as described above, the Note Holder will have the right to be paid back by me for all of its costs and expenses in enforcing this Note to the extent not prohibited by applicable law. Those expenses include, for example, reasonable attorneys' fees.

**8. GIVING OF NOTICES**

Unless applicable law requires a different method, any notice that must be given to me under this Note will be given by delivering it or by mailing it by first class mail to me at the Property Address above or at a different address if I give the Note Holder a notice of my different address.

Any notice that must be given to the Note Holder under this Note will be given by delivering it or by mailing it by first class mail to the Note Holder at the address stated in Section 3(A) above or at a different address if I am given a notice of that different address.

**9. OBLIGATIONS OF PERSONS UNDER THIS NOTE**

If more than one person signs this Note, each person is fully and personally obligated to keep all of the promises made in this Note, including the promise to pay the full amount owed. Any person who is a guarantor, surety or endorser of this Note is also obligated to do these things. Any person who takes over these obligations, including the obligations of a guarantor, surety or endorser of this Note, is also obligated to keep all of the promises made in this Note. The Note Holder may enforce its rights under this Note against each person individually or against all of us together. This means that any one of us may be required to pay all of the amounts owed under this Note.

**10. WAIVERS**

I and any other person who has obligations under this Note waive the rights of Presentment and Notice of Dishonor. "Presentment" means the right to require the Note Holder to demand payment of amounts due. "Notice of Dishonor" means the right to require the Note Holder to give notice to other persons that amounts due have not been paid.

**11. UNIFORM SECURED NOTE**

This Note is a uniform instrument with limited variations in some jurisdictions. In addition to the protections given to the Note Holder under this Note, a Mortgage, Deed of Trust or Security Deed (the "Security Instrument"), dated the same date as this Note, protects the Note Holder from possible losses which might result if I do not keep the promises which I make in this Note. That Security Instrument describes how and under what conditions I may be required to make immediate payment in full of all amounts I owe under this Note. Some of those conditions are described as follows:

Transfer of the Property or a Beneficial Interest in Borrower. If all or any part of the Property or any Interest in the Property is sold or transferred (or if a beneficial interest in Borrower is sold or transferred and Borrower is not a natural person) without Lender's prior written consent, Lender may, at its option, require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law as of the date of this Security Instrument. Lender also shall not exercise this option if: (a) Borrower causes to be submitted to Lender information required by Lender to evaluate the intended transferee as if a new loan were being made to the transferee; and (b) Lender reasonably determines that Lender's security will not be impaired by the loan assumption and that the risk of a breach of any covenant or agreement in this Security Instrument is acceptable to Lender.

To the extent permitted by Applicable Law, Lender may charge a reasonable fee as a condition to Lender's consent to the loan assumption. Lender may also require the transferee to sign an assumption agreement that is acceptable to Lender and that obligates the transferee to keep all the promises and agreements made in the Note and in this Security Instrument. Borrower will continue to be obligated under the Note and this Security Instrument unless Lender releases Borrower in writing.

If Lender exercises the option to require immediate payment in full, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

WITNESS THE HAND(S) AND SEAL(S) OF THE UNDERSIGNED.

_Claire E. Fisher_  3-25-04      _Robert E. Fisher_  3-25-04
Borrower **Claire E Fisher**          Date          Borrower **Robert E Fisher**          Date

_____          _____
Borrower          Date          Borrower          Date

_____          _____
Borrower          Date          Borrower          Date

_____          _____
Borrower          Date          Borrower          Date

## TITLE PROBLEMS/ISSUES FOR RESOLUTION:

1. Based on the parameters of the search, there are no impediments to insuring title, other than the items listed below.

DATE: 01/17/2018

LTS File No: L█████████          Client File No:█████████

SEARCH GOOD THRU: 12/29/2017

Prepared for:

    Phelan Hallinan Diamond & Jones, PC
    400 Fellowship Road
    Suite 100
    Mount Laurel, NJ 08054

# FORECLOSURE SEARCH REPORT

Premises:    1170 Lewis Terrace, West Deptford Township, NJ 08096-1163
    West Deptford Township
    Gloucester County

This Title Report is for informational purposes only. Based upon the examination of evidence in the appropriate public records, Company sets forth that the premises endorsed hereon are subject to the following liens, encumbrances and exceptions to title. This Report does not constitute title insurance, and liability hereunder is assumed by the Company solely in its capacity as an abstractor for its negligence, mistakes or omissions in a sum not to exceed Two Thousand Dollars.

## DESCRIPTION

BEGINNING AT A POINT IN THE SOUTHEASTERLY LINE OF LEWIS TERRACE (50 FEET WIDE) A TOTAL DISTANCE OF 299.45 FEET MEASURED NORTHEASTWARDLY ALONG THE TANGENT AND CURVED SOUTHEASTERLY LINES OF LEWIS TERRACE FROM A POINT MARKING THE NORTHEASTERLY END OF THE CURVED EASTERLY CORNER OF LEWIS TERRACE AND FORD AVENUE (50 FEET WIDE) SAID CORNER HAVING A RADIUS OF 25 FEET SAID BEGINNING POINT BEING IN THE DIVISION LINE BETWEEN LOTS 14 AND 15, PLAN HEREINAFTER MENTIONED; THENCE

(1) NORTH 22 DEGREES 17 MINUTES 30 SECONDS EAST ALONG THE SOUTHEASTERLY LINE OF LEWIS TERRACE 64 FEET TO A POINT IN DIVISION LINE BETWEEN LOTS 15 AND 16 SAID PLAN; THENCE

(2) SOUTH 67 DEGREES 42 MINUTES 30 SECONDS EAST ALONG LAST MENTIONED DIVISION LINE 118.13 FEET TO A POINT IN REAR LINE OF LOT 5 SAID PLAN; THENCE

(3) SOUTH 24 DEGREES 39 MINUTES 10 SECONDS WEST ALONG DIVISION LINE BETWEEN LOT 15 AND PART OF LOTS 5 AND 6, SAID PLAN, 64.06 FEET TO A POINT IN DIVISION LINE BETWEEN LOTS 14 AND 15 AFORESAID; THENCE

(4) NORTH 67 DEGREES 42 MINUTES 30 SECONDS WEST ALONG LAST MENTIONED DIVISION LINE 115.49 FEET TO A POINT IN THE SOUTHEASTERLY LINE OF LEWIS TERRACE AND PLACE OF BEGINNING.

BEING LOT 15, BLOCK 132 A, PLAN OF HARKER VILLAGE MADE BY WILLIAM A. E. CONOVER, PROFESSIONAL ENGINEER AND LAND SURVEYOR, DATED APRIL, 1955, FILED.

COMMONLY KNOWN AS: 1170 LEWIS TERRACE, WEST DEPTFORD TOWNSHIP, NEW JERSEY 08096

LOT 15 BLOCK 132.01

BEING THE SAME PROPERTY CONVEYED TO ROBERT E. FISHER AND CLAIRE E. FISHER, BY DEED DATED APRIL 30, 1998, FROM MARGARET M. WOLF, EXECUTRIX OF THE ESTATE OF DONALD THOMAS MEAGHER, DECEASED, OF RECORD IN BOOK 2872 PAGE 230, OFFICE OF THE GLOUCESTER COURT CLERK.

## RECORD OWNER

<u>TITLE TO SAID PREMISES IS VESTED IN</u> Robert E. Fisher and Claire E. Fisher by deed from Margaret M. Wolf, Executrix of the Estate of Donald Thomas Meagher, deceased, dated 04/30/1998 and recorded 05/05/1998 in Book 2872, page 230.

**Notes: Mae M. Meagher departed this life, vesting title in Donald Thomas Meagher;**
**Donald Thomas Meagher departed this life on 01/16/1998.**

## PRIOR DEED INFORMATION

<u>TITLE TO SAID PREMISES IS VESTED IN</u> Donald Thomas Meagher and Mae M. Meagher, h/w, by Deed from Woodbury Village, Inc., a Corporation of the State of New Jersey, dated 10/08/1956, recorded 10/30/1956 in Book 858, Page 260.

### Subject to the encumbrances and claims as follows:

<u>BLOCK:</u> 132.01      <u>LOT:</u> 15

<u>TAXES:</u>                          As shown on attachment

<u>SURROGATES:</u>                  None showing.

<u>MORTGAGES:</u>

1. $132,000.00              Robert E. Fisher and Claire E. Fisher, h/w
                            To: Chase Manhattan Mortgage Corp.
                            Dated: 03/25/2004, Recorded: 04/19/2004
                            Mortgage Book: 7519, Page 34
                            Mortgagee's Addr: 343 Thornall Street, Edison, NJ 08837

NOTICE OF LIS PENDENS:      JPMorgan Chase Bank, National Association versus Claire E. Fisher, et.
                            al.; recorded 11/20/2017 as Inst#

<u>COUNTY JUDGMENTS:</u>           None showing.

<u>IRS/USA LIENS:</u>

(1)          Department of the Treasury- Internal Revenue Service, No Address Provided *VS.*
             Robert Fisher, Jr., 341 Lynn Avenue, Wenonah, NJ 08090-1040, Docket No. , dated:
             11/30/2017, in the amount of $16,175.80; recorded: 12/11/2017 in Book: 139, Page
             224.
             (FEDERAL TAX LIEN)

<u>TAX SALE CERTIFICATES:</u>   None showing.

<u>N.J. SUPERIOR COURT, U.S. DISTRICT COURT, & BANKRUPTCY:</u> As shown on attachment.

DOCKET# 24588

Type: MTG
PAGES: 20

JAMES N. HOGAN
GLOUCESTER COUNTY CLERK
RECEIPT#: 18488

04/19/2004                    02:47:52 P.M.
MB 7519        34

GLOUCESTER COUNTY RECORDING DATA PAGE

0/119

PLEASE DO NOT DETACH THIS PAGE FROM THE ORIGINAL
DOCUMENT AS IT CONTAINS IMPORTANT INFORMATION AND
IS PART OF THE PERMANENT RECORD.

210-1

RECORD & RETURN TO:

Netco
2 Executive Campus
Ste 105
Cherry Hill NJ 08002

GLOUCESTER COUNTY RECORDING DATA PAGE
JAMES N. HOGAN, COUNTY CLERK

Return To:
~~Chase Manhattan Mortgage~~
Corp.
Att: Document Control,
Dept 400, 10790 Rancho
~~Bernardo Rd. San Diego__CA~~
~~92127~~

NETCO
2 EXECUTIVE CAMPUS
SUITE 105
CHERRY HILL NJ. 08002

Prepared By:
Berry, Cora

 93?

——————[Space Above This Line For Recording Data]——————

# MORTGAGE

## DEFINITIONS

Words used in multiple sections of this document are defined below and other words are defined in Sections 3, 11, 13, 18, 20 and 21. Certain rules regarding the usage of words used in this document are also provided in Section 16.

(A) "Security Instrument" means this document, which is dated March 25, 2004
together with all Riders to this document.

(B) "Borrower" is Robert E Fisher and Claire E Fisher, Husband and Wife

Borrower is the mortgagor under this Security Instrument.

(C) "Lender" is Chase Manhattan Mortgage Corp.

Lender is a Corporation
organized and existing under the laws of New Jersey

969

NEW JERSEY - Single Family - Fannie Mae/Freddie Mac UNIFORM INSTRUMENT            Form 3031 1/01

-6(NJ) (0005)

Page 1 of 15                                   Initials

VMP MORTGAGE FORMS - (800)521-7291

Lender's address is 343 Thornall Street
Edison, New Jersey  08837
Lender is the mortgagee under this Security Instrument.

(D) "Note" means the promissory note signed by Borrower and dated March 25, 2004
The Note states that Borrower owes Lender
One Hundred Thirty-Two Thousand and 00/100ths                          Dollars
(U.S. $132,000.00            ) plus interest. Borrower has promised to pay this debt in regular Periodic
Payments and to pay the debt in full not later than April 1, 2034

(E) "Property" means the property that is described below under the heading "Transfer of Rights in the
Property."

(F) "Loan" means the debt evidenced by the Note, plus interest, any prepayment charges and late charges
due under the Note, and all sums due under this Security Instrument, plus interest.

(G) "Riders" means all Riders to this Security Instrument that are executed by Borrower. The following
Riders are to be executed by Borrower [check box as applicable]:

| | | |
|---|---|---|
| [X] Adjustable Rate Rider | [ ] Condominium Rider | [ ] Second Home Rider |
| [ ] Balloon Rider | [ ] Planned Unit Development Rider | [ ] 1-4 Family Rider |
| [ ] VA Rider | [ ] Biweekly Payment Rider | [ ] Other(s) [specify] |

(H) "Applicable Law" means all controlling applicable federal, state and local statutes, regulations,
ordinances and administrative rules and orders (that have the effect of law) as well as all applicable final,
non-appealable judicial opinions.

(I) "Community Association Dues, Fees, and Assessments" means all dues, fees, assessments and other
charges that are imposed on Borrower or the Property by a condominium association, homeowners
association or similar organization.

(J) "Electronic Funds Transfer" means any transfer of funds, other than a transaction originated by
check, draft, or similar paper instrument, which is initiated through an electronic terminal, telephonic
instrument, computer, or magnetic tape so as to order, instruct, or authorize a financial institution to debit
or credit an account. Such term includes, but is not limited to, point-of-sale transfers, automated teller
machine transactions, transfers initiated by telephone, wire transfers, and automated clearinghouse
transfers.

(K) "Escrow Items" means those items that are described in Section 3.

(L) "Miscellaneous Proceeds" means any compensation, settlement, award of damages, or proceeds paid
by any third party (other than insurance proceeds paid under the coverages described in Section 5) for: (i)
damage to, or destruction of, the Property; (ii) condemnation or other taking of all or any part of the
Property; (iii) conveyance in lieu of condemnation; or (iv) misrepresentations of, or omissions as to, the
value and/or condition of the Property.

(M) "Mortgage Insurance" means insurance protecting Lender against the nonpayment of, or default on,
the Loan.

(N) "Periodic Payment" means the regularly scheduled amount due for (i) principal and interest under the
Note, plus (ii) any amounts under Section 3 of this Security Instrument.

(O) "RESPA" means the Real Estate Settlement Procedures Act (12 U.S.C. Section 2601 et seq.) and its
implementing regulation, Regulation X (24 C.F.R. Part 3500), as they might be amended from time to
time, or any additional or successor legislation or regulation that governs the same subject matter. As used
in this Security Instrument, "RESPA" refers to all requirements and restrictions that are imposed in regard
to a "federally related mortgage loan" even if the Loan does not qualify as a "federally related mortgage
loan" under RESPA.

-6(NJ) (0005)                         969           Page 2 of 15           Initials:          Form 3031 1/01

(P) "Successor in Interest of Borrower" means any party that has taken title to the Property, whether or not that party has assumed Borrower's obligations under the Note and/or this Security Instrument.

TRANSFER OF RIGHTS IN THE PROPERTY

This Security Instrument secures to Lender: (i) the repayment of the Loan, and all renewals, extensions and modifications of the Note; and (ii) the performance of Borrower's covenants and agreements under this Security Instrument and the Note. For these purposes, Borrower does hereby mortgage, grant and convey to Lender the following described property located in the COUNTY of Gloucester :

[Type of Recording Jurisdiction]          [Name of Recording Jurisdiction]

See Attached Schedule A

Property Account Number: ████████015          which currently has the address of
1170 Lewis Ter                                                                           [Street]
West Deptford Twp                      [City], New Jersey 08096          [Zip Code]
("Property Address"):

TOGETHER WITH all the improvements now or hereafter erected on the property, and all easements, appurtenances, and fixtures now or hereafter a part of the property. All replacements and additions shall also be covered by this Security Instrument. All of the foregoing is referred to in this Security Instrument as the "Property."

BORROWER COVENANTS that Borrower is lawfully seised of the estate hereby conveyed and has the right to grant and convey the Property and that the Property is unencumbered, except for encumbrances of record. Borrower warrants and will defend generally the title to the Property against all claims and demands, subject to any encumbrances of record.

THIS SECURITY INSTRUMENT combines uniform covenants for national use and non-uniform covenants with limited variations by jurisdiction to constitute a uniform security instrument covering real property.

UNIFORM COVENANTS. Borrower and Lender covenant and agree as follows:

1. **Payment of Principal, Interest, Escrow Items, Prepayment Charges, and Late Charges.** Borrower shall pay when due the principal of, and interest on, the debt evidenced by the Note and any prepayment charges and late charges due under the Note. Borrower shall also pay funds for Escrow Items pursuant to Section 3. Payments due under the Note and this Security Instrument shall be made in U.S. currency. However, if any check or other instrument received by Lender as payment under the Note or this

███████369          Initials: _____

-6(NJ) (0005)          Page 3 of 15          Form 3031 1/01

Security Instrument is returned to Lender unpaid, Lender may require that any or all subsequent payments due under the Note and this Security Instrument be made in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality, or entity; or (d) Electronic Funds Transfer.

Payments are deemed received by Lender when received at the location designated in the Note or at such other location as may be designated by Lender in accordance with the notice provisions in Section 15. Lender may return any payment or partial payment if the payment or partial payments are insufficient to bring the Loan current. Lender may accept any payment or partial payment insufficient to bring the Loan current, without waiver of any rights hereunder or prejudice to its rights to refuse such payment or partial payments in the future. If Lender accepts such payments, it shall apply such payments at the time such payments are accepted. No offset or claim which Borrower might have now or in the future against Lender shall relieve Borrower from making payments due under the Note and this Security Instrument or performing the covenants and agreements secured by this Security Instrument.

2. **Application of Payments or Proceeds.** Except as otherwise described in this Section 2, all payments accepted and applied by Lender shall be applied in the following order of priority: (a) interest due under the Note; (b) principal due under the Note; (c) amounts due under Section 3. Such payments shall be applied to each Periodic Payment in the order in which it became due. Any remaining amounts shall be applied first to late charges, second to any other amounts due under this Security Instrument, and then to reduce the principal balance of the Note.

If Lender receives a payment from Borrower for a delinquent Periodic Payment which includes a sufficient amount to pay any late charge due, the payment may be applied to the delinquent payment and the late charge. If more than one Periodic Payment is outstanding, Lender may apply any payment received from Borrower to the repayment of the Periodic Payments if, and to the extent that, each payment can be paid in full. To the extent that any excess exists after the payment is applied to the full payment of one or more Periodic Payments, such excess may be applied to any late charges due. Voluntary prepayments shall be applied first to any prepayment charges and then as described in the Note.

Any application of payments, insurance proceeds, or Miscellaneous Proceeds to principal due under the Note shall not extend or postpone the due date, or change the amount, of the Periodic Payments.

3. **Funds for Escrow Items.** Borrower shall pay to Lender on the day Periodic Payments are due under the Note, until the Note is paid in full, a sum (the "Funds") to provide for payment of amounts due for: (a) taxes and assessments and other items which can attain priority over this Security Instrument as a lien or encumbrance on the Property; (b) leasehold payments or ground rents on the Property, if any; (c) premiums for any and all insurance required by Lender under Section 5; and (d) Mortgage Insurance premiums, if any, or any sums payable by Borrower to Lender in lieu of the payment of Mortgage Insurance premiums in accordance with the provisions of Section 10. These items are called "Escrow Items." At origination or at any time during the term of the Loan, Lender may require that Community Association Dues, Fees, and Assessments, if any, be escrowed by Borrower, and such dues, fees and assessments shall be an Escrow Item. Borrower shall promptly furnish to Lender all notices of amounts to be paid under this Section. Borrower shall pay Lender the Funds for Escrow Items unless Lender waives Borrower's obligation to pay the Funds for any or all Escrow Items. Lender may waive Borrower's obligation to pay to Lender Funds for any or all Escrow Items at any time. Any such waiver may only be in writing. In the event of such waiver, Borrower shall pay directly, when and where payable, the amounts

due for any Escrow Items for which payment of Funds has been waived by Lender and, if Lender requires, shall furnish to Lender receipts evidencing such payment within such time period as Lender may require. Borrower's obligation to make such payments and to provide receipts shall for all purposes be deemed to be a covenant and agreement contained in this Security Instrument, as the phrase "covenant and agreement" is used in Section 9. If Borrower is obligated to pay Escrow Items directly, pursuant to a waiver, and Borrower fails to pay the amount due for an Escrow Item, Lender may exercise its rights under Section 9 and pay such amount and Borrower shall then be obligated under Section 9 to repay to Lender any such amount. Lender may revoke the waiver as to any or all Escrow Items at any time by a notice given in accordance with Section 15 and, upon such revocation, Borrower shall pay to Lender all Funds, and in such amounts, that are then required under this Section 3.

Lender may, at any time, collect and hold Funds in an amount (a) sufficient to permit Lender to apply the Funds at the time specified under RESPA, and (b) not to exceed the maximum amount a lender can require under RESPA. Lender shall estimate the amount of Funds due on the basis of current data and reasonable estimates of expenditures of future Escrow Items or otherwise in accordance with Applicable Law.

The Funds shall be held in an institution whose deposits are insured by a federal agency, instrumentality, or entity (including Lender, if Lender is an institution whose deposits are so insured) or in any Federal Home Loan Bank. Lender shall apply the Funds to pay the Escrow Items no later than the time specified under RESPA. Lender shall not charge Borrower for holding and applying the Funds, annually analyzing the escrow account, or verifying the Escrow Items, unless Lender pays Borrower interest on the Funds and Applicable Law permits Lender to make such a charge. Unless an agreement is made in writing or Applicable Law requires interest to be paid on the Funds, Lender shall not be required to pay Borrower any interest or earnings on the Funds. Borrower and Lender can agree in writing, however, that interest shall be paid on the Funds. Lender shall give to Borrower, without charge, an annual accounting of the Funds as required by RESPA.

If there is a surplus of Funds held in escrow, as defined under RESPA, Lender shall account to Borrower for the excess funds in accordance with RESPA. If there is a shortage of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the shortage in accordance with RESPA, but in no more than 12 monthly payments. If there is a deficiency of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the deficiency in accordance with RESPA, but in no more than 12 monthly payments.

Upon payment in full of all sums secured by this Security Instrument, Lender shall promptly refund to Borrower any Funds held by Lender.

4. **Charges; Liens.** Borrower shall pay all taxes, assessments, charges, fines, and impositions attributable to the Property which can attain priority over this Security Instrument, leasehold payments or ground rents on the Property, if any, and Community Association Dues, Fees, and Assessments, if any. To the extent that these items are Escrow Items, Borrower shall pay them in the manner provided in Section 3.

Borrower shall promptly discharge any lien which has priority over this Security Instrument unless Borrower: (a) agrees in writing to the payment of the obligation secured by the lien in a manner acceptable to Lender, but only so long as Borrower is performing such agreement; (b) contests the lien in good faith by, or defends against enforcement of the lien in, legal proceedings which in Lender's opinion operate to prevent the enforcement of the lien while those proceedings are pending, but only until such proceedings are concluded; or (c) secures from the holder of the lien an agreement satisfactory to Lender subordinating the lien to this Security Instrument. If Lender determines that any part of the Property is subject to a lien which can attain priority over this Security Instrument, Lender may give Borrower a notice identifying the

lien. Within 10 days of the date on which that notice is given, Borrower shall satisfy the lien or take one or more of the actions set forth above in this Section 4.

Lender may require Borrower to pay a one-time charge for a real estate tax verification and/or reporting service used by Lender in connection with this Loan.

**5. Property Insurance.** Borrower shall keep the improvements now existing or hereafter erected on the Property insured against loss by fire, hazards included within the term "extended coverage," and any other hazards including, but not limited to, earthquakes and floods, for which Lender requires insurance. This insurance shall be maintained in the amounts (including deductible levels) and for the periods that Lender requires. What Lender requires pursuant to the preceding sentences can change during the term of the Loan. The insurance carrier providing the insurance shall be chosen by Borrower subject to Lender's right to disapprove Borrower's choice, which right shall not be exercised unreasonably. Lender may require Borrower to pay, in connection with this Loan, either: (a) a one-time charge for flood zone determination, certification and tracking services; or (b) a one-time charge for flood zone determination and certification services and subsequent charges each time remappings or similar changes occur which reasonably might affect such determination or certification. Borrower shall also be responsible for the payment of any fees imposed by the Federal Emergency Management Agency in connection with the review of any flood zone determination resulting from an objection by Borrower.

If Borrower fails to maintain any of the coverages described above, Lender may obtain insurance coverage, at Lender's option and Borrower's expense. Lender is under no obligation to purchase any particular type or amount of coverage. Therefore, such coverage shall cover Lender, but might or might not protect Borrower, Borrower's equity in the Property, or the contents of the Property, against any risk, hazard or liability and might provide greater or lesser coverage than was previously in effect. Borrower acknowledges that the cost of the insurance coverage so obtained might significantly exceed the cost of insurance that Borrower could have obtained. Any amounts disbursed by Lender under this Section 5 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

All insurance policies required by Lender and renewals of such policies shall be subject to Lender's right to disapprove such policies, shall include a standard mortgage clause, and shall name Lender as mortgagee and/or as an additional loss payee. Lender shall have the right to hold the policies and renewal certificates. If Lender requires, Borrower shall promptly give to Lender all receipts of paid premiums and renewal notices. If Borrower obtains any form of insurance coverage, not otherwise required by Lender, for damage to, or destruction of, the Property, such policy shall include a standard mortgage clause and shall name Lender as mortgagee and/or as an additional loss payee.

In the event of loss, Borrower shall give prompt notice to the insurance carrier and Lender. Lender may make proof of loss if not made promptly by Borrower. Unless Lender and Borrower otherwise agree in writing, any insurance proceeds, whether or not the underlying insurance was required by Lender, shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such insurance proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such insurance proceeds, Lender shall not be required to pay Borrower any interest or earnings on such proceeds. Fees for public adjusters, or other third parties, retained by Borrower shall not be paid out of the insurance proceeds and shall be the sole obligation of Borrower. If the restoration or repair is not economically feasible or Lender's security would be lessened, the insurance proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with

the excess, if any, paid to Borrower. Such insurance proceeds shall be applied in the order provided for in Section 2.

If Borrower abandons the Property, Lender may file, negotiate and settle any available insurance claim and related matters. If Borrower does not respond within 30 days to a notice from Lender that the insurance carrier has offered to settle a claim, then Lender may negotiate and settle the claim. The 30-day period will begin when the notice is given. In either event, or if Lender acquires the Property under Section 22 or otherwise, Borrower hereby assigns to Lender (a) Borrower's rights to any insurance proceeds in an amount not to exceed the amounts unpaid under the Note or this Security Instrument, and (b) any other of Borrower's rights (other than the right to any refund of unearned premiums paid by Borrower) under all insurance policies covering the Property, insofar as such rights are applicable to the coverage of the Property. Lender may use the insurance proceeds either to repair or restore the Property or to pay amounts unpaid under the Note or this Security Instrument, whether or not then due.

**6. Occupancy.** Borrower shall occupy, establish, and use the Property as Borrower's principal residence within 60 days after the execution of this Security Instrument and shall continue to occupy the Property as Borrower's principal residence for at least one year after the date of occupancy, unless Lender otherwise agrees in writing, which consent shall not be unreasonably withheld, or unless extenuating circumstances exist which are beyond Borrower's control.

**7. Preservation, Maintenance and Protection of the Property; Inspections.** Borrower shall not destroy, damage or impair the Property, allow the Property to deteriorate or commit waste on the Property. Whether or not Borrower is residing in the Property, Borrower shall maintain the Property in order to prevent the Property from deteriorating or decreasing in value due to its condition. Unless it is determined pursuant to Section 5 that repair or restoration is not economically feasible, Borrower shall promptly repair the Property if damaged to avoid further deterioration or damage. If insurance or condemnation proceeds are paid in connection with damage to, or the taking of, the Property, Borrower shall be responsible for repairing or restoring the Property only if Lender has released proceeds for such purposes. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. If the insurance or condemnation proceeds are not sufficient to repair or restore the Property, Borrower is not relieved of Borrower's obligation for the completion of such repair or restoration.

Lender or its agent may make reasonable entries upon and inspections of the Property. If it has reasonable cause, Lender may inspect the interior of the improvements on the Property. Lender shall give Borrower notice at the time of or prior to such an interior inspection specifying such reasonable cause.

**8. Borrower's Loan Application.** Borrower shall be in default if, during the Loan application process, Borrower or any persons or entities acting at the direction of Borrower or with Borrower's knowledge or consent gave materially false, misleading, or inaccurate information or statements to Lender (or failed to provide Lender with material information) in connection with the Loan. Material representations include, but are not limited to, representations concerning Borrower's occupancy of the Property as Borrower's principal residence.

**9. Protection of Lender's Interest in the Property and Rights Under this Security Instrument.** If (a) Borrower fails to perform the covenants and agreements contained in this Security Instrument, (b) there is a legal proceeding that might significantly affect Lender's interest in the Property and/or rights under this Security Instrument (such as a proceeding in bankruptcy, probate, for condemnation or forfeiture, for enforcement of a lien which may attain priority over this Security Instrument or to enforce laws or regulations), or (c) Borrower has abandoned the Property, then Lender may do and pay for whatever is reasonable or appropriate to protect Lender's interest in the Property and rights under this Security Instrument, including protecting and/or assessing the value of the Property, and securing and/or repairing the Property. Lender's actions can include, but are not limited to: (a) paying any sums secured by a lien which has priority over this Security Instrument; (b) appearing in court; and (c) paying reasonable

Initials: _____    Form 3031 1/01

attorneys' fees to protect its interest in the Property and/or rights under this Security Instrument, including its secured position in a bankruptcy proceeding. Securing the Property includes, but is not limited to, entering the Property to make repairs, change locks, replace or board up doors and windows, drain water from pipes, eliminate building or other code violations or dangerous conditions, and have utilities turned on or off. Although Lender may take action under this Section 9, Lender does not have to do so and is not under any duty or obligation to do so. It is agreed that Lender incurs no liability for not taking any or all actions authorized under this Section 9.

Any amounts disbursed by Lender under this Section 9 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

If this Security Instrument is on a leasehold, Borrower shall comply with all the provisions of the lease. If Borrower acquires fee title to the Property, the leasehold and the fee title shall not merge unless Lender agrees to the merger in writing.

**10. Mortgage Insurance.** If Lender required Mortgage Insurance as a condition of making the Loan, Borrower shall pay the premiums required to maintain the Mortgage Insurance in effect. If, for any reason, the Mortgage Insurance coverage required by Lender ceases to be available from the mortgage insurer that previously provided such insurance and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to obtain coverage substantially equivalent to the Mortgage Insurance previously in effect, at a cost substantially equivalent to the cost to Borrower of the Mortgage Insurance previously in effect, from an alternate mortgage insurer selected by Lender. If substantially equivalent Mortgage Insurance coverage is not available, Borrower shall continue to pay to Lender the amount of the separately designated payments that were due when the insurance coverage ceased to be in effect. Lender will accept, use and retain these payments as a non-refundable loss reserve in lieu of Mortgage Insurance. Such loss reserve shall be non-refundable, notwithstanding the fact that the Loan is ultimately paid in full, and Lender shall not be required to pay Borrower any interest or earnings on such loss reserve. Lender can no longer require loss reserve payments if Mortgage Insurance coverage (in the amount and for the period that Lender requires) provided by an insurer selected by Lender again becomes available, is obtained, and Lender requires separately designated payments toward the premiums for Mortgage Insurance. If Lender required Mortgage Insurance as a condition of making the Loan and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to maintain Mortgage Insurance in effect, or to provide a non-refundable loss reserve, until Lender's requirement for Mortgage Insurance ends in accordance with any written agreement between Borrower and Lender providing for such termination or until termination is required by Applicable Law. Nothing in this Section 10 affects Borrower's obligation to pay interest at the rate provided in the Note.

Mortgage Insurance reimburses Lender (or any entity that purchases the Note) for certain losses it may incur if Borrower does not repay the Loan as agreed. Borrower is not a party to the Mortgage Insurance.

Mortgage insurers evaluate their total risk on all such insurance in force from time to time, and may enter into agreements with other parties that share or modify their risk, or reduce losses. These agreements are on terms and conditions that are satisfactory to the mortgage insurer and the other party (or parties) to these agreements. These agreements may require the mortgage insurer to make payments using any source of funds that the mortgage insurer may have available (which may include funds obtained from Mortgage Insurance premiums).

As a result of these agreements, Lender, any purchaser of the Note, another insurer, any reinsurer, any other entity, or any affiliate of any of the foregoing, may receive (directly or indirectly) amounts that derive from (or might be characterized as) a portion of Borrower's payments for Mortgage Insurance, in exchange for sharing or modifying the mortgage insurer's risk, or reducing losses. If such agreement provides that an affiliate of Lender takes a share of the insurer's risk in exchange for a share of the premiums paid to the insurer, the arrangement is often termed "captive reinsurance." Further:

**(a)** Any such agreements will not affect the amounts that Borrower has agreed to pay for Mortgage Insurance, or any other terms of the Loan. Such agreements will not increase the amount Borrower will owe for Mortgage Insurance, and they will not entitle Borrower to any refund.

(b) Any such agreements will not affect the rights Borrower has - if any - with respect to the Mortgage Insurance under the Homeowners Protection Act of 1998 or any other law. These rights may include the right to receive certain disclosures, to request and obtain cancellation of the Mortgage Insurance, to have the Mortgage Insurance terminated automatically, and/or to receive a refund of any Mortgage Insurance premiums that were unearned at the time of such cancellation or termination.

11. Assignment of Miscellaneous Proceeds; Forfeiture. All Miscellaneous Proceeds are hereby assigned to and shall be paid to Lender.

If the Property is damaged, such Miscellaneous Proceeds shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such Miscellaneous Proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may pay for the repairs and restoration in a single disbursement or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such Miscellaneous Proceeds, Lender shall not be required to pay Borrower any interest or earnings on such Miscellaneous Proceeds. If the restoration or repair is not economically feasible or Lender's security would be lessened, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower. Such Miscellaneous Proceeds shall be applied in the order provided for in Section 2.

In the event of a total taking, destruction, or loss in value of the Property, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is equal to or greater than the amount of the sums secured by this Security Instrument immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the sums secured by this Security Instrument shall be reduced by the amount of the Miscellaneous Proceeds multiplied by the following fraction: (a) the total amount of the sums secured immediately before the partial taking, destruction, or loss in value divided by (b) the fair market value of the Property immediately before the partial taking, destruction, or loss in value. Any balance shall be paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is less than the amount of the sums secured immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument whether or not the sums are then due.

If the Property is abandoned by Borrower, or if, after notice by Lender to Borrower that the Opposing Party (as defined in the next sentence) offers to make an award to settle a claim for damages, Borrower fails to respond to Lender within 30 days after the date the notice is given, Lender is authorized to collect and apply the Miscellaneous Proceeds either to restoration or repair of the Property or to the sums secured by this Security Instrument, whether or not then due. "Opposing Party" means the third party that owes Borrower Miscellaneous Proceeds or the party against whom Borrower has a right of action in regard to Miscellaneous Proceeds.

Borrower shall be in default if any action or proceeding, whether civil or criminal, is begun that, in Lender's judgment, could result in forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. Borrower can cure such a default and, if acceleration has occurred, reinstate as provided in Section 19, by causing the action or proceeding to be dismissed with a ruling that, in Lender's judgment, precludes forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. The proceeds of any award or claim for damages that are attributable to the impairment of Lender's interest in the Property are hereby assigned and shall be paid to Lender.

All Miscellaneous Proceeds that are not applied to restoration or repair of the Property shall be applied in the order provided for in Section 2.

**12. Borrower Not Released; Forbearance By Lender Not a Waiver.** Extension of the time for payment or modification of amortization of the sums secured by this Security Instrument granted by Lender to Borrower or any Successor in Interest of Borrower shall not operate to release the liability of Borrower or any Successors in Interest of Borrower. Lender shall not be required to commence proceedings against any Successor in Interest of Borrower or to refuse to extend time for payment or otherwise modify amortization of the sums secured by this Security Instrument by reason of any demand made by the original Borrower or any Successors in Interest of Borrower. Any forbearance by Lender in exercising any right or remedy including, without limitation, Lender's acceptance of payments from third persons, entities or Successors in Interest of Borrower or in amounts less than the amount then due, shall not be a waiver of or preclude the exercise of any right or remedy.

**13. Joint and Several Liability; Co-signers; Successors and Assigns Bound.** Borrower covenants and agrees that Borrower's obligations and liability shall be joint and several. However, any Borrower who co-signs this Security Instrument but does not execute the Note (a "co-signer"): (a) is co-signing this Security Instrument only to mortgage, grant and convey the co-signer's interest in the Property under the terms of this Security Instrument; (b) is not personally obligated to pay the sums secured by this Security Instrument; and (c) agrees that Lender and any other Borrower can agree to extend, modify, forbear or make any accommodations with regard to the terms of this Security Instrument or the Note without the co-signer's consent.

Subject to the provisions of Section 18, any Successor in Interest of Borrower who assumes Borrower's obligations under this Security Instrument in writing, and is approved by Lender, shall obtain all of Borrower's rights and benefits under this Security Instrument. Borrower shall not be released from Borrower's obligations and liability under this Security Instrument unless Lender agrees to such release in writing. The covenants and agreements of this Security Instrument shall bind (except as provided in Section 20) and benefit the successors and assigns of Lender.

**14. Loan Charges.** Lender may charge Borrower fees for services performed in connection with Borrower's default, for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument, including, but not limited to, attorneys' fees, property inspection and valuation fees. In regard to any other fees, the absence of express authority in this Security Instrument to charge a specific fee to Borrower shall not be construed as a prohibition on the charging of such fee. Lender may not charge fees that are expressly prohibited by this Security Instrument or by Applicable Law.

If the Loan is subject to a law which sets maximum loan charges, and that law is finally interpreted so that the interest or other loan charges collected or to be collected in connection with the Loan exceed the permitted limits, then: (a) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already collected from Borrower which exceeded permitted limits will be refunded to Borrower. Lender may choose to make this refund by reducing the principal owed under the Note or by making a direct payment to Borrower. If a refund reduces principal, the reduction will be treated as a partial prepayment without any prepayment charge (whether or not a prepayment charge is provided for under the Note). Borrower's acceptance of any such refund made by direct payment to Borrower will constitute a waiver of any right of action Borrower might have arising out of such overcharge.

**15. Notices.** All notices given by Borrower or Lender in connection with this Security Instrument must be in writing. Any notice to Borrower in connection with this Security Instrument shall be deemed to have been given to Borrower when mailed by first class mail or when actually delivered to Borrower's notice address if sent by other means. Notice to any one Borrower shall constitute notice to all Borrowers unless Applicable Law expressly requires otherwise. The notice address shall be the Property Address unless Borrower has designated a substitute notice address by notice to Lender. Borrower shall promptly notify Lender of Borrower's change of address. If Lender specifies a procedure for reporting Borrower's change of address, then Borrower shall only report a change of address through that specified procedure. There may be only one designated notice address under this Security Instrument at any one time. Any notice to Lender shall be given by delivering it or by mailing it by first class mail to Lender's address stated herein unless Lender has designated another address by notice to Borrower. Any notice in connection with this Security Instrument shall not be deemed to have been given to Lender until actually received by Lender. If any notice required by this Security Instrument is also required under Applicable Law, the Applicable Law requirement will satisfy the corresponding requirement under this Security Instrument.

**16. Governing Law; Severability; Rules of Construction.** This Security Instrument shall be governed by federal law and the law of the jurisdiction in which the Property is located. All rights and obligations contained in this Security Instrument are subject to any requirements and limitations of Applicable Law. Applicable Law might explicitly or implicitly allow the parties to agree by contract or it might be silent, but such silence shall not be construed as a prohibition against agreement by contract. In the event that any provision or clause of this Security Instrument or the Note conflicts with Applicable Law, such conflict shall not affect other provisions of this Security Instrument or the Note which can be given effect without the conflicting provision.

As used in this Security Instrument: (a) words of the masculine gender shall mean and include corresponding neuter words or words of the feminine gender; (b) words in the singular shall mean and include the plural and vice versa; and (c) the word "may" gives sole discretion without any obligation to take any action.

**17. Borrower's Copy.** Borrower shall be given one copy of the Note and of this Security Instrument.

**18. Transfer of the Property or a Beneficial Interest in Borrower.** As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law.

If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

**19. Borrower's Right to Reinstate After Acceleration.** If Borrower meets certain conditions, Borrower shall have the right to have enforcement of this Security Instrument discontinued at any time prior to the earliest of: (a) five days before sale of the Property pursuant to any power of sale contained in this Security Instrument; (b) such other period as Applicable Law might specify for the termination of Borrower's right to reinstate; or (c) entry of a judgment enforcing this Security Instrument. Those conditions are that Borrower: (a) pays Lender all sums which then would be due under this Security Instrument and the Note as if no acceleration had occurred; (b) cures any default of any other covenants or agreements; (c) pays all expenses incurred in enforcing this Security Instrument, including, but not limited to, reasonable attorneys' fees, property inspection and valuation fees, and other fees incurred for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument; and (d) takes such action as Lender may reasonably require to assure that Lender's interest in the Property and rights under this Security Instrument, and Borrower's obligation to pay the sums secured by this Security Instrument, shall continue unchanged. Lender may require that Borrower pay such reinstatement sums and expenses in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality or entity; or (d) Electronic Funds Transfer. Upon reinstatement by Borrower, this Security Instrument and obligations secured hereby shall remain fully effective as if no acceleration had occurred. However, this right to reinstate shall not apply in the case of acceleration under Section 18.

**20. Sale of Note; Change of Loan Servicer; Notice of Grievance.** The Note or a partial interest in the Note (together with this Security Instrument) can be sold one or more times without prior notice to Borrower. A sale might result in a change in the entity (known as the "Loan Servicer") that collects Periodic Payments due under the Note and this Security Instrument and performs other mortgage loan servicing obligations under the Note, this Security Instrument, and Applicable Law. There also might be one or more changes of the Loan Servicer unrelated to a sale of the Note. If there is a change of the Loan Servicer, Borrower will be given written notice of the change which will state the name and address of the

new Loan Servicer, the address to which payments should be made and any other information RESPA requires in connection with a notice of transfer of servicing. If the Note is sold and thereafter the Loan is serviced by a Loan Servicer other than the purchaser of the Note, the mortgage loan servicing obligations to Borrower will remain with the Loan Servicer or be transferred to a successor Loan Servicer and are not assumed by the Note purchaser unless otherwise provided by the Note purchaser.

Neither Borrower nor Lender may commence, join, or be joined to any judicial action (as either an individual litigant or the member of a class) that arises from the other party's actions pursuant to this Security Instrument or that alleges that the other party has breached any provision of, or any duty owed by reason of, this Security Instrument, until such Borrower or Lender has notified the other party (with such notice given in compliance with the requirements of Section 15) of such alleged breach and afforded the other party hereto a reasonable period after the giving of such notice to take corrective action. If Applicable Law provides a time period which must elapse before certain action can be taken, that time period will be deemed to be reasonable for purposes of this paragraph. The notice of acceleration and opportunity to cure given to Borrower pursuant to Section 22 and the notice of acceleration given to Borrower pursuant to Section 18 shall be deemed to satisfy the notice and opportunity to take corrective action provisions of this Section 20.

21. **Hazardous Substances.** As used in this Section 21: (a) "Hazardous Substances" are those substances defined as toxic or hazardous substances, pollutants, or wastes by Environmental Law and the following substances: gasoline, kerosene, other flammable or toxic petroleum products, toxic pesticides and herbicides, volatile solvents, materials containing asbestos or formaldehyde, and radioactive materials; (b) "Environmental Law" means federal laws and laws of the jurisdiction where the Property is located that relate to health, safety or environmental protection; (c) "Environmental Cleanup" includes any response action, remedial action, or removal action, as defined in Environmental Law; and (d) an "Environmental Condition" means a condition that can cause, contribute to, or otherwise trigger an Environmental Cleanup.

Borrower shall not cause or permit the presence, use, disposal, storage, or release of any Hazardous Substances, or threaten to release any Hazardous Substances, on or in the Property. Borrower shall not do, nor allow anyone else to do, anything affecting the Property (a) that is in violation of any Environmental Law, (b) which creates an Environmental Condition, or (c) which, due to the presence, use, or release of a Hazardous Substance, creates a condition that adversely affects the value of the Property. The preceding two sentences shall not apply to the presence, use, or storage on the Property of small quantities of Hazardous Substances that are generally recognized to be appropriate to normal residential uses and to maintenance of the Property (including, but not limited to, hazardous substances in consumer products).

Borrower shall promptly give Lender written notice of (a) any investigation, claim, demand, lawsuit or other action by any governmental or regulatory agency or private party involving the Property and any Hazardous Substance or Environmental Law of which Borrower has actual knowledge, (b) any Environmental Condition, including but not limited to, any spilling, leaking, discharge, release or threat of release of any Hazardous Substance, and (c) any condition caused by the presence, use or release of a Hazardous Substance which adversely affects the value of the Property. If Borrower learns, or is notified by any governmental or regulatory authority, or any private party, that any removal or other remediation of any Hazardous Substance affecting the Property is necessary, Borrower shall promptly take all necessary remedial actions in accordance with Environmental Law. Nothing herein shall create any obligation on Lender for an Environmental Cleanup.

NON-UNIFORM COVENANTS. Borrower and Lender further covenant and agree as follows:

**22. Acceleration; Remedies.** Lender shall give notice to Borrower prior to acceleration following Borrower's breach of any covenant or agreement in this Security Instrument (but not prior to acceleration under Section 18 unless Applicable Law provides otherwise). The notice shall specify: (a) the default; (b) the action required to cure the default; (c) a date, not less than 30 days from the date the notice is given to Borrower, by which the default must be cured; (d) that failure to cure the default on or before the date specified in the notice may result in acceleration of the sums secured by this Security Instrument, foreclosure by judicial proceeding and sale of the Property; (e) the Borrower's right to reinstate after acceleration and the right to assert in the foreclosure proceeding the non-existence of a default or any other defense of Borrower to acceleration and foreclosure; and (f) any other disclosure required under the Fair Foreclosure Act, codified at Sections 2A:50-53 et seq. of the New Jersey Statutes, or other Applicable Law. If the default is not cured on or before the date specified in the notice, Lender at its option may require immediate payment in full of all sums secured by this Security Instrument without further demand and may foreclose this Security Instrument by judicial proceeding. Lender shall be entitled to collect all expenses incurred in pursuing the remedies provided in this Section 22, including, but not limited to, attorneys' fees and costs of title evidence permitted by Rules of Court.

**23. Release.** Upon payment of all sums secured by this Security Instrument, Lender shall cancel this Security Instrument. Borrower shall pay any recordation costs. Lender may charge Borrower a fee for releasing this Security Instrument, but only if the fee is paid to a third party for services rendered and the charging of the fee is permitted under Applicable Law.

**24. No Claim of Credit for Taxes.** Borrower will not make deduction from or claim credit on the principal or interest secured by this Security Instrument by reason of any governmental taxes, assessments or charges. Borrower will not claim any deduction from the taxable value of the Property by reason of this Security Instrument.

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this Security Instrument and in any Rider executed by Borrower and recorded with it.

Signed, sealed and delivered in the presence of:

_____

*Claire E. Fisher* _____ (Seal)

Claire E Fisher                                        -Borrower

_____

*Robert E. Fisher* _____ (Seal)

Robert E Fisher                                       -Borrower

_____ (Seal)                    _____ (Seal)
-Borrower                                                    -Borrower

_____ (Seal)                    _____ (Seal)
-Borrower                                                    -Borrower

_____ (Seal)                    _____ (Seal)
-Borrower                                                    -Borrower

969

-6(NJ) (0005)                          Page 14 of 15                          Form 3031 1/01

STATE OF NEW JERSEY,  *Gloucester*  County ss:

On this 25TH  day of March, 2004  , before me, the subscriber,
personally appeared **Claire E Fisher  and Robert E Fisher**

who, I am satisfied,
is/are the person(s) named in and who executed the within instrument, and thereupon acknowledged that
he/she/they signed, sealed and delivered the same as his/her/their act and deed, for the purposes therein
expressed.

Notary Public

PATRICK D. HINDMAN
FOREIGN COMMISSIONER OF DEEDS
STATE OF NEW JERSEY
Commission Expires May 29, 2006

969

# ADJUSTABLE RATE RIDER
### (LIBOR Index - Rate Caps)

THIS ADJUSTABLE RATE RIDER is made this 25TH                    day of March,  2004
, and is incorporated into and shall be deemed to amend and supplement
the Mortgage, Deed of Trust or Security Deed (the "Security Instrument") of the same date given by the
undersigned (the "Borrower") to secure Borrower's Adjustable Rate Note (the "Note") to
Chase Manhattan Mortgage Corp.

                                                                                      (the "Lender")
a corporation organized and existing under the laws of New Jersey
of the same date and covering the property described in the Security Instrument and located at:
1170 Lewis Ter
West Deptford Twp, New Jersey  08096

                            (Property Address)

THE NOTE CONTAINS PROVISIONS ALLOWING FOR CHANGES IN THE INTEREST RATE
AND THE MONTHLY PAYMENT. THE NOTE LIMITS THE AMOUNT THE BORROWER'S
INTEREST RATE CAN CHANGE AT ANY ONE TIME AND THE MAXIMUM RATE THE
BORROWER MUST PAY.

ADDITIONAL COVENANTS. In addition to the covenants and agreements made in the Security
Instrument, Borrower and Lender further covenant and agree as follows:
A. INTEREST RATE AND MONTHLY PAYMENT CHANGES
The Note provides for an initial interest rate of Six and 875/1000
6.875                                                                                      %.

MULTISTATE LIBOR ARM RIDER
BC-6733.LT (1/01) Page 1 of 3 (replaces 2/00)

The Note provides for changes in the interest rate and the monthly payments, as follows:

## 4. INTEREST RATE AND MONTHLY PAYMENT CHANGES

### (A) Change Dates

The interest rate I will pay may change on the 1ST       day of April, 2006 and on that day every sixth month thereafter. Each date on which my interest rate could change is called "Change Date".

### (B) The Index

Beginning with the first Change Date, my interest rate will be based on an Index. The "Index" is the average of interbank offered rates for six month U.S. dollar-denominated deposits in the London market ("LIBOR"), as published in *The Wall Street Journal*. The most recent Index figure available as of the date 45 days before each Change Date is called the "Current Index".

If the Index is no longer available, the Note Holder will choose a new index which is based upon comparable information. The Note Holder will give me notice of this choice.

### (C) Calculation of Changes

Before each Change Date, the Note Holder will calculate my new interest rate by adding Three and 500/1000 percentage points (3.500       %) to the Current Index. The Note Holder will then round the result of this addition to the nearest one-eighth of one percentage point (0.125%). Subject to the limits stated in Section 4(D) below, this rounded amount will be my new interest rate until the next Change Date.

The Note Holder will then determine the amount of the monthly payment that would be sufficient to repay the unpaid principal that I am expected to owe at the Change Date in full on the Maturity Date at my new interest rate in substantially equal payments. The result of this calculation will be the new amount of my monthly payment.

### (D) Limits on Interest Rate Changes

The interest rate I am required to pay at the first Change Date will not be greater than 9.875                                                                          % or less than 6.875

                                                                                          %.
Thereafter, my interest rate will never be increased or decreased on any single Change Date by more than one and a half percentage points (1.5%) from the rate of interest I have been paying for the preceding six months. My interest rate will never be greater than 13.875                                                                        % and will never be lower than 6.875                                                                %.


MULTISTATE LIBOR ARM RIDER
BC-6733.LT (1/01) Page 2 of 3 (replaces 2/00)

**(E) Effective Date of Changes**

My new interest rate will become effective on each Change Date. I will pay the amount of my new monthly payment beginning on the first monthly payment after the Change Date until the amount of my monthly payment changes again.

**(F) Notice of Changes**

The Note Holder will deliver or mail to me a notice of any changes in my interest rate and the amount of my monthly payment before the effective date of any change. The notice will include information required by law to be given to me and also the title and telephone number of a person who will answer any question I may have regarding the notice.

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this Adjustable Rate Rider.

| | | | |
|---|---|---|---|
| _Claire E. Fisher_ | | _Robert E Fisher_ | 3-25-04 |
| Borrower Claire E Fisher | Date | Borrower Robert E Fisher | Date |
| | | | |
| Borrower | Date | Borrower | Date |
| | | | |
| Borrower | Date | Borrower | Date |
| | | | |
| Borrower | Date | Borrower | Date |

MULTISTATE LIBOR ARM RIDER
BC-6733.LT  (1/01)  Page 3 of 3 (replaces 2/00)

File No. PHI364932

Appendix A

BEGINNING AT A POINT IN THE SOUTHEASTERLY LINE OF LEWIS TERRACE (50 FEET WIDE) A TOTAL DISTANCE OF 299.45 FEET MEASURED NORTHEASTWARDLY ALONG THE TANGENT AND CURVED SOUTHEASTERLY LINES OF LEWIS TERRACE FROM A POINT MARKING THE NORTHEASTERLY END OF THE CURVED EASTERLY CORNER OF LEWIS TERRACE AND FORD AVENUE (50 FEET WIDE) SAID CORNER HAVING A RADIUS OF 25 FEET SAID BEGINNING POINT BEING IN THE DIVISION LINE BETWEEN LOTS 14 AND 15, PLAN HEREINAFTER MENTIONED; THENCE

(1) NORTH 22 DEGREES 17 MINUTES 30 SECONDS EAST ALONG THE SOUTHEASTERLY LINE OF LEWIS TERRACE 64 FEET TO A POINT IN DIVISION LINE BETWEEN LOTS 15 AND 16 SAID PLAN; THENCE

(2) SOUTH 67 DEGREES 42 MINUTES 30 SECONDS EAST ALONG LAST MENTIONED DIVISION LINE 118.13 FEET TO A POINT IN REAR LINE OF LOT 5 SAID PLAN; THENCE

(3) SOUTH 24 DEGREES 39 MINUTES 10 SECONDS WEST ALONG DIVISION LINE BETWEEN LOT 15 AND PART OF LOTS 5 AND 6, SAID PLAN, 64.06 FEET TO A POINT IN DIVISION LINE BETWEEN LOTS 14 AND 15 AFORESAID; THENCE

(4) NORTH 67 DEGREES 42 MINUTES 30 SECONDS WEST ALONG LAST MENTIONED DIVISION LINE 115.49 FEET TO A POINT IN THE SOUTHEASTERLY LINE OF LEWIS TERRACE AND PLACE OF BEGINNING.

BEING LOT 15, BLOCK 132 A, PLAN OF HARKER VILLAGE MADE BY WILLIAM A. E. CONOVER, PROFESSIONAL ENGINEER AND LAND SURVEYOR, DATED APRIL, 1955, FILED.

COMMONLY KNOWN AS: 1170 LEWIS TERRACE WEST DEPFORD TOWNSHIP, NEW JERSEY 08096

LOT 15 BLOCK 132.01.

BEING THE SAME PROPERTY CONVEYED TO ROBERT E. FISHER AND CLAIRE E. FISHER, BY DEED DATED APRIL 30, 1998, FROM MARGARET M. WOLF, EXECUTRIX OF THE ESTATE OF DONALD THOMAS MEAGHER, DECEASED, OF RECORD IN BOOK 2872 PAGE 230, OFFICE OF THE GLOUCESTER COURT CLERK.

RECEIVED
JUN 2 8 2004
DOCUMENT CONTROL

cmt-Short Form Commitment

**LTS ACQUISITION CO., LLC.**
400 Fellowship Road, Suite 250
Mt. Laurel, NJ 08054
Phone: 856-793-3200
Fax: 856-813-5521

Date:     January 9, 2018

To:     Debbra Dribin

Phone:     (856) 562-0410
Fax:

Request:     Foreclosure Search Report - NJ

File No.:     ████████105)

Customer: Phelan Hallinan Diamond & Jones, PC

Servicer:     JPMORGAN CHASE BANK, NATIONAL ASSOCIATION

Mortgage Date:     03/25/2004

Mortgage Amount:     $132,000.00     Book: 7519    Page: 34

Need Search By:     01/10/2018

Owner:     CLAIRE E. FISHER, A/K/A CLAIRE FISHER A/K/A CLAIRE E. AMBURG
MR. FISHER, HUSBAND OF CLAIRE E. FISHER
ROBERT E. FISHER, A/K/A ROBERT FISHER
MRS. ROBERT E. FISHER, HIS WIFE
STEWARD FINANCIAL SERVICES LLC
NEW CENTURY FINANCIAL SERVICES
BURLINGTON COUNTY BOARD OF SOCIAL SERVICES
CORINNE C. GRAVES
EILEEN DAVIS
KIMBERLY D. SWANSON
STATE OF NEW JERSEY

Street Address:     1170 LEWIS TERRACE
WEST DEPTFORD TOWNSHIP, NJ 08096-1163

County:     Gloucester
Municipality:     West Deptford Township
Block     132.01
Lot:     15

**TITLE REPORT**

County Gloucester

TITLE # 3529025

Municipality: West Deptford

Street: 1170 Lewis Terrace

Block 132.01 Lot 16    Filed Map #

Title In Robert E Fisher & Claire E. Fisher

By deed dated 4/30/98 recorded 6/5/98 book 2872 page 230

Mortgages:
$ 132,000~ book 7519 page 34 dated 3/25/04 rec 4/19/04 LP
held by Chase Manhattan Mortgage Corp (46952)
Assigned to: _____ bk _____ pg _____

$ _____ book _____ page _____ dated _____ rec _____
held by _____
Assigned to: _____ bk _____ pg _____

$ _____ book _____ page _____ dated _____ rec _____
held by _____
Assigned to: _____ bk _____ pg _____

Assessment Liens: $ _____ book _____ page _____ rec _____
$ _____ book _____ page _____ rec _____

Tax Sale Certificates: $ _____ book _____ page _____ rec _____
$ _____ book _____ page _____ rec _____

Federal Liens: 139-224

Restrictions: _____
Easements/Grants: _____
Construction Liens: _____
Financing Statements: _____
Institutional Liens: _____
Judgments: _____
ITW / Surrogate: Donald Thomas Meagher dec 1/16/98

Board Date: 12/29/17

File # 3529025
County Gloucester

Town West Deptford
Lot 15    Blk 132.01

1. Donald Thomas Meagher    from 10/7/66    to 5/6/98
2. Mae M. Meagher    from "    to "
3. Margaret Wolf    from 1/16/98    to "
4.    from    to
5.    from    to
6. Robert E Fisher    from 4/29/98    to 12/29/17
7. Claire E Fisher    from "    to "
8.    from    to

Deeds: 858-260

2872-(230)
4777-296 / National Park
4671-296 / Westville

Mortgages:

▮▮▮▮▮▮  6/18/04
m/A 4744-103 (3665-260)
7519-(34) OPEN

4036-298 0
9708-96 / 26/131.03
10894-40 ✓ Deptford
AB 153-126
AB 216-184 (10984-40)

Judgments (LPs)

LP 3490 (7519-34) D2/22/68
LP 13826 (7519-34) D2/4/17
LP (459521 7519-34)
LP5673 (10894-40) u
LP19824 (10894-40) u
FTL    Mechanics Lien

139-224

Surrogates

POD Donald Thomas Meagher dec 1/16/98
EST
ITW
TIDE

Financing Statements    Construction Liens

Board Date: 12/23/17

# This Indenture, MADE THE

Eighth    day of    October    in the year of our Lord one thousand nine hundred and Fifty-Six

Between WOODBURY VILLAGE, INC., A Corporation of the State of New Jersey

PARTY                  of the first part, and

DONALD THOMAS MEAGHER AND MAE M. MEAGHER, H/W

PARTY                  of the second part;

Witnesseth, That the said party of the first part, for and in consideration of the sum of

ONE DOLLAR ($1.00)

lawful money of the United States of America, and other good and valuable consideration

well and truly paid by the said party of the second part to the said party of the first part, at and before the ensealing and delivery of these presents, the receipt whereof is hereby acknowledged, has granted, bargained, sold, aliened, enfeoffed, released, conveyed and confirmed and by these presents does grant, bargain, sell, alien, enfeoff, release, convey and confirm, unto the said party of the second part,

their heirs and        and assigns.

ALL that certain tract or parcel of land and premises situate in the Township of West Deptford, County of Gloucester and State of New Jersey, bounded and described as follows:

BEGINNING at a point in the Southeasterly line of Lewis Terrace (50 feet wide) a total distance of 899.45 feet measured Northeasterly along the tangent and curved Southeasterly lines of Lewis Terrace from a point marking the Northeasterly end of the curved Easterly corner of Lewis Terrace and Ford Avenue (50 feet wide) said corner having a radius of 25 feet said beginning point being in the division line between lots 14 and 15, plan hereinafter mentioned; thence (1) North 22 degrees 17 minutes 30 seconds East along the Southeasterly line of Lewis Terrace 64 feet to a point in division line between lots 15 and 16 said plan; thence (2) South 67 degrees 42 minutes 30 seconds East along said mentioned division line 114/33 feet to a point in rear line of lot 5 said plan; thence (3) South 24 degrees 39 minutes 18 seconds West along division line between lots 15 and part of lots

5 and 6, said plan, 64.06 feet to a point in division line between lots 14 and 15 aforesaid; thence (4) North 67 degrees 42 minutes 30 seconds West along last mentioned division line 115.49 feet to a point in the Southeasterly line of Lewis Terrace and place of beginning.

SEIZED Lot 15, Block 152 A, Plan of Barker Village made by Wm. A. E. Conover, Professional Engineer and Land Surveyor, dated April 1955. Filed.

**Together** with all and singular the improvements, woods, ways, rights, liberties, privileges, hereditaments and appurtenances to the same belonging or in any wise appertaining, and the reversion and reversions, remainder and remainders, rents, issues, and profits thereof, and of every part and parcel thereof; **And also** all the estate, right, title, interest, property, possession, claim and demand whatsoever, both in law and equity, of the said party of the first part, of, in and to the said premises, and every part thereof, with the appurtenances;

**To have and to hold** the said premises above described, with all and singular the hereditaments and appurtenances, unto the said party of the second part,
their heirs                 and assigns, to the only proper use, benefit and behoof of the said party of the second part
their heirs           and assigns forever.

**And** the said party of the first part for itself and its successors

do es                       by these presents covenant, grant and agree, to and with the said party of the second part,    their heirs      and assigns, that     it         the said party of the first part, and  its successors       all and singular the hereditaments and premises above described and granted, or mentioned and intended so to be, with the appurtenances, unto the said party of the second part,    their heirs           and assigns, against     it          the said party of the first part, and   its successors        and against all and every person or persons whomsoever lawfully claiming or to claim the same, or any part thereof,

shall and will                                           warrant and forever defend.

**In Witness Whereof,** the said party of the first part to these presents hath hereunto set its Corporate seal and caused these presents to be signed by its President and attested by its Secretary

dated the day and year first above written.

Signed, Sealed and Delivered )        WOODBURY VILLAGE, INC.,
  in the Presence of            )

ATTEST:                                        _____
                                                                President

_____
          Secretary

STATE OF NEW JERSEY

GLOUCESTER COUNTY, } ss. Be it Remembered, that on this Eighth day of October in the year of our Lord one thousand nine hundred and Fifty-Six before me, the undersigned authority personally appeared WILLIAM SELTZER who being by me duly sworn on his oath saith, that he is the SECRETARY of WOODBURY VILLAGE, INC.

the grantor within named, and that VIVIAN C. SELTZER is the President, that deponent knows the common or corporate seal of said grantor and that the seal annexed to the within Deed or Conveyance is such common or corporate seal; that the said Deed or Conveyance was signed by the said President and the seal of said grantor affixed thereto in the presence of deponent; that said Deed or Conveyance was signed, sealed and delivered as and for the voluntary act and deed of said grantor for the uses and purposes therein expressed, pursuant to a resolution of the Board of Directors of said grantor; and at the execution thereof this deponent subscribed his name thereto as witness.

Sworn and Subscribed the day and year aforesaid.

Notary Public of New Jersey
My Commission Expires November 15, 1958

In compliance with the statute I have presented an abstract of the within to the assessor of the taxing district therein mentioned.
R. EDWARD KLAISZ
County Clerk

Deed—Corporation

DEED

Dated ________ 19__

Received in the Clerk's office of the County of Gloucester on the 10 day of Oct A.D. 1956 at 1:35 o'clock in the after noon, and recorded in Book 858 of DEEDS for said County, on page 26060

R. Edward Klaisz, Clerk

CONTINENTAL LAND TITLE INS. CO.
324 FEDERAL STREET
CAMDEN 3, NEW JERSEY

STATE OF
COUNTY OF

Be it Remembered, That on this day of in the year of our Lord one thousand nine hundred and before me, personally appeared who, I am satisfied the grantor mentioned in the above deed or conveyance, and acknowledged that signed, sealed and delivered the same as act and deed. All of which is hereby certified.

M 919—Bargain and sale deed, covenant as to grantor's acts.    © 1981 Julius Blumberg, Inc., Publisher, NYC 10013
statutory deed language, Ind. or corp.—2-82

DB2872-P230

Consult your Lawyer before signing this deed — it has important legal consequences.

# Deed

017758

**Date**

This Deed is made on April 30,      19 98 between

**Parties**

**Grantor**
*Full name(s)
and post
office address*

M.
MARGARET WOLF, Executrix of the Estate of
DONALD THOMAS MEAGHER, DECEASED,
317 W. ADAMS AVENUE
MAGNOLIA, NEW JERSEY  08049

Grantor, and

**Grantee**
*Full name(s)
and post
office address*

ROBERT E. FISHER &
CLAIRE E. FISHER,
11 MAPLEWOOD COURT
WEST DEPTFORD, NEW JERSEY  08066

Grantee.

(The words "Grantor" and "Grantee" include all Grantors and all
Grantees under this Deed.)

**Consideration**

In return for the payment to the Grantor by the Grantee of

**Conveyance**

EIGHTY-NINE THOUSAND NINE HUNDRED ------------ Dollars ($ 89,900.00      ),
the Grantor grants and conveys to the Grantee all of the land located in the
TOWNSHIP    of  WEST DEPTFORD    County of  GLOUCESTER
and State of New Jersey, specifically described as follows:

**Description
of Land**

BEGINNING at a point in the Southeasterly line of Lewis Terrace
(50 feet wide) a total distance of 299.45 feet measured Northeastwardly
along the tangent and curved Southeasterly Lines of Lewis Terrace from a
point marking the Northeasterly end of the curved Easterly corner of Lewis
Terrace and Ford Avenue (50 feet wide) said corner having a radius of 25 feet
said beginning point being in the division line between Lots 14 and 15, plan
hereinafter mentioned; thence

(1)  North 22 degrees 17 minutes 30 seconds East along the
Southeasterly line of Lewis Terrace 64 feet to a point in division line
between Lots 15 and 16 said plan; thence

(2)  South 67 degrees 42 minutes 30 seconds East along last
mentioned division line 118.13 feet to a point in rear line of Lot 5 said
plan; thence

(3)  South 24 degrees 39 minutes 10 seconds West along division
line between Lot 15 and part of Lots 5 and 6, said plan, 64.06 feet to a
point in division line between Lots 14 and 15 aforesaid; thence

(4)  North 67 degrees 42 minutes 30 seconds West along last
mentioned division line 115.49 feet to a point in the Southeasterly line of
Lewis Terrace and place of BEGINNING.

BEING Lot 15, Block 132 A, Plan of Harker Village made by Wm.
- A.E. Conover, Professional Engineer and Land Surveyor, dated April, 1955,
filed.

BEING Lot 15, Block 132.01, Tax Map.

BEING COMMONLY known as 1170 Lewis Terrace.

ALSO BEING The same lands and premises which were granted to
Donald Thomas Meagher and Mae M. Meagher, husband and wife, by Deed from
Woodbury Village, Inc., a Corporation of the State of New Jersey, dated
10-8-56, recorded 10-30-56, in Deed Book 858, Page 260.

Consideration $ 8
County 98.60
rexxx 224.51
State R.P.R.L.F
10.00
Dollar RS/05/1998

Consideration $ 8
89900.00 Exempt Code: S
R.P.R.L.F
10.00
Total
315.00

This Deed was prepared by ......GARY W. STUHLTRAGER, ESQ..................................

Print or type name.

DB2872-P231

THE SAID MAE M. MEAGHER died on _____, whereupon title
vested in DONALD THOMAS MEAGHER by right of survivorship.

DONALD THOMAS MEAGHER died on 1-16-98 leaving a Last Will and Testament
dated 9-17-97 and probated in Gloucester County on 1-20-98, wherein
Margaret Wolf was appointed Executrix.

**DB2872-P232**

**Municipal Lot and Block or Account Number**

The land is now designated as Lot 15 in Block 132-01 on the municipal tax map (or as Account No. ).

*Check box if applicable*

☐ No property tax identification number for the land is available at the time of this conveyance.

**Covenant as to Grantor's Acts**

The Grantor covenants that the Grantor has done no act to encumber the land.

**Receipt of Consideration**

The Grantor has received the full payment from the Grantee.

**Signature of Grantor**

The Grantor signs this Deed on the first date above. If the Grantor is a corporation this Deed is signed by its corporate officers and its corporate seal is affixed.

Signed, sealed and delivered in the presence of or attested by:

*Margaret M. Wolf* (SEAL)

MARGARET WOLF, Executrix of the Estate of Donald Thomas Meagher, Deceased (SEAL)

.......................................... (SEAL)
Witness

.......................................... (SEAL)

.......................................... (SEAL)

---

**CERTIFICATE OF ACKNOWLEDGMENT BY INDIVIDUAL**

State of New Jersey, County of Gloucester

I am a
an officer authorized to take acknowledgments and proofs in this State. I sign this acknowledgment below to certify that it was made before me.

On April 30 , 198 , MARGARET WOLF, Executrix of the Estate of Donald Thomas Meagher, Deceased,
appeared before me in person. (If more than one person appears, the words "this person" shall include all persons named who appeared before the officer and made this acknowledgment.) I am satisfied that this person is the person named in and who signed this Deed. This person acknowledged signing, sealing and delivering this Deed as this person's act and deed for the uses and purposes expressed in this Deed.

This person also acknowledged that the full and actual consideration paid or to be paid for the transfer of title to realty evidenced by this Deed, as such consideration is defined in P.L. 1968, c. 49, §1(c), is $ 89,900.00 .

*Juliane Bruynell*
JULIANE BRUYNELL
NOTARY PUBLIC OF NEW JERSEY
My Commission Expires February 20, 1999

---

**CORPORATE PROOF BY THE SUBSCRIBING WITNESS**

State of New Jersey, County of

I am a
an officer authorized to take acknowledgments and proofs in this State.

On .................................. , 19....... ,
(from now on called the "Witness") appeared before me in person. The Witness was duly sworn by me according to law under oath and stated and proved to my satisfaction that:

1. The Witness is the.................................................. ...Secretary of the Corporation which is the Grantor in this Deed
2. .................................................... the officer who signed this Deed, is the.......................President of the Corporation (from now on called the "Corporate Officer").
3. The making, signing, sealing, and delivery of this Deed have been duly authorized by a proper resolution of the Board of Directors of the Corporation.
4. The Witness knows the corporate seal of the Corporation. The seal affixed to this Deed is the corporate seal of the Corporation. The seal was affixed to this Deed by the Corporate Officer. The Corporate Officer signed and delivered this Deed as and for the voluntary act and deed of the Corporation. All this was done in the presence of the Witness who signed this Deed as attesting witness. The Witness signs this proof to attest to the truth of these facts.

The Witness also acknowledged that the full and actual consideration paid or to be paid for the transfer of title to realty evidenced by this Deed, as such consideration is defined in P.L. 1968, c. 49, §1(c), is $..................

Sworn to and signed before me on the date written above.

..........................................
*Witness, sign above and print or type name below*

..........................................
*Officer's signature. Print, stamp or type name and title directly hereunder.*

DB2872-P233



# Deed

MARGARET WOLF, EXECUTRIX OF THE
ESTATE OF DONALD THOMAS MEAGHER,
DECEASED,

*to*

ROBERT E. FISHER and
CLAIRE E. FISHER,

Record and return to:

CHARGE & RETURN:
Congress Title Corp.
67 Euclid Street,
Woodbury, NY 11806

JAMES N. HOGAN
COUNTY CLERK

RECORDED
GLOUCESTER COUNTY
98 MAY -5 PM 2:52
58 13840

DOCKET# 24588

Type: MTG
PAGES: 20

JAMES N. HOGAN
GLOUCESTER COUNTY CLERK
RECEIPT#: 18488

04/19/2004          02:47:52 P.M.
MB 7519        34

## GLOUCESTER COUNTY RECORDING DATA PAGE

PLEASE DO NOT DETACH THIS PAGE FROM THE ORIGINAL
DOCUMENT AS IT CONTAINS IMPORTANT INFORMATION AND
IS PART OF THE PERMANENT RECORD.

RECORD & RETURN TO:

Netco
2 Executive Campus
Ste 105
Cherry Hill NJ 08002

Return To:
~~Chase Manhattan Mortgage~~
Corp.
Att: Document Control,
Dept. 400, 10790 Rancho
Bernardo Rd. San Diego, CA
92127
Prepared By:
Berry, Cora

NETCO
2 EXECUTIVE CAMPUS
SUITE 105
CHERRY HILL NJ. 08002



————————|Space Above This Line For Recording Data|————————

# MORTGAGE

## DEFINITIONS

Words used in multiple sections of this document are defined below and other words are defined in Sections 3, 11, 13, 18, 20 and 21. Certain rules regarding the usage of words used in this document are also provided in Section 16.

(A) "Security Instrument" means this document, which is dated March 25, 2004 together with all Riders to this document.

(B) "Borrower" is Robert E Fisher and Claire E Fisher, Husband and Wife

Borrower is the mortgagor under this Security Instrument.

(C) "Lender" is Chase Manhattan Mortgage Corp.

Lender is a Corporation
organized and existing under the laws of New Jersey

[blacked out]969

NEW JERSEY - Single Family - Fannie Mae/Freddie Mac UNIFORM INSTRUMENT       Form 3031 1/01

-6(NJ) (0005)
Page 1 of 15                     Initials

VMP MORTGAGE FORMS - (800)521-7291

Lender's address is 343 Thornall Street
Edison, New Jersey  08837
Lender is the mortgagee under this Security Instrument.

(D) "Note" means the promissory note signed by Borrower and dated March 25, 2004
The Note states that Borrower owes Lender

One Hundred Thirty-Two Thousand and 00/100ths                                    Dollars
(U.S. $132,000.00          ) plus interest. Borrower has promised to pay this debt in regular Periodic
Payments and to pay the debt in full not later than April 1, 2034

(E) "Property" means the property that is described below under the heading "Transfer of Rights in the
Property."

(F) "Loan" means the debt evidenced by the Note, plus interest, any prepayment charges and late charges
due under the Note, and all sums due under this Security Instrument, plus interest.

(G) "Riders" means all Riders to this Security Instrument that are executed by Borrower. The following
Riders are to be executed by Borrower [check box as applicable]:

| | | |
|---|---|---|
| [X] Adjustable Rate Rider | [ ] Condominium Rider | [ ] Second Home Rider |
| [ ] Balloon Rider | [ ] Planned Unit Development Rider | [ ] 1-4 Family Rider |
| [ ] VA Rider | [ ] Biweekly Payment Rider | [ ] Other(s) [specify] |

(H) "Applicable Law" means all controlling applicable federal, state and local statutes, regulations,
ordinances and administrative rules and orders (that have the effect of law) as well as all applicable final,
non-appealable judicial opinions.

(I) "Community Association Dues, Fees, and Assessments" means all dues, fees, assessments and other
charges that are imposed on Borrower or the Property by a condominium association, homeowners
association or similar organization.

(J) "Electronic Funds Transfer" means any transfer of funds, other than a transaction originated by
check, draft, or similar paper instrument, which is initiated through an electronic terminal, telephonic
instrument, computer, or magnetic tape so as to order, instruct, or authorize a financial institution to debit
or credit an account. Such term includes, but is not limited to, point-of-sale transfers, automated teller
machine transactions, transfers initiated by telephone, wire transfers, and automated clearinghouse
transfers.

(K) "Escrow Items" means those items that are described in Section 3.

(L) "Miscellaneous Proceeds" means any compensation, settlement, award of damages, or proceeds paid
by any third party (other than insurance proceeds paid under the coverages described in Section 5) for: (i)
damage to, or destruction of, the Property; (ii) condemnation or other taking of all or any part of the
Property; (iii) conveyance in lieu of condemnation; or (iv) misrepresentations of, or omissions as to, the
value and/or condition of the Property.

(M) "Mortgage Insurance" means insurance protecting Lender against the nonpayment of, or default on,
the Loan.

(N) "Periodic Payment" means the regularly scheduled amount due for (i) principal and interest under the
Note, plus (ii) any amounts under Section 3 of this Security Instrument.

(O) "RESPA" means the Real Estate Settlement Procedures Act (12 U.S.C. Section 2601 et seq.) and its
implementing regulation, Regulation X (24 C.F.R. Part 3500), as they might be amended from time to
time, or any additional or successor legislation or regulation that governs the same subject matter. As used
in this Security Instrument, "RESPA" refers to all requirements and restrictions that are imposed in regard
to a "federally related mortgage loan" even if the Loan does not qualify as a "federally related mortgage
loan" under RESPA.

969

(P) "Successor in Interest of Borrower" means any party that has taken title to the Property, whether or not that party has assumed Borrower's obligations under the Note and/or this Security Instrument.

TRANSFER OF RIGHTS IN THE PROPERTY

This Security Instrument secures to Lender: (i) the repayment of the Loan, and all renewals, extensions and modifications of the Note; and (ii) the performance of Borrower's covenants and agreements under this Security Instrument and the Note. For these purposes, Borrower does hereby mortgage, grant and convey to Lender the following described property located in the COUNTY of Gloucester

[Type of Recording Jurisdiction]   [Name of Recording Jurisdiction]

See Attached Schedule A

Property Account Number: 4     0015   which currently has the address of

1170 Lewis Ter

West Deptford Twp   [Street]

("Property Address"):   [City], New Jersey 08096   [Zip Code]

TOGETHER WITH all the improvements now or hereafter erected on the property, and all easements, appurtenances, and fixtures now or hereafter a part of the property. All replacements and additions shall also be covered by this Security Instrument. All of the foregoing is referred to in this Security Instrument as the "Property."

BORROWER COVENANTS that Borrower is lawfully seised of the estate hereby conveyed and has the right to grant and convey the Property and that the Property is unencumbered, except for encumbrances of record. Borrower warrants and will defend generally the title to the Property against all claims and demands, subject to any encumbrances of record.

THIS SECURITY INSTRUMENT combines uniform covenants for national use and non-uniform covenants with limited variations by jurisdiction to constitute a uniform security instrument covering real property.

UNIFORM COVENANTS. Borrower and Lender covenant and agree as follows:

1. Payment of Principal, Interest, Escrow Items, Prepayment Charges, and Late Charges. Borrower shall pay when due the principal of, and interest on, the debt evidenced by the Note and any prepayment charges and late charges due under the Note. Borrower shall also pay funds for Escrow Items pursuant to Section 3. Payments due under the Note and this Security Instrument shall be made in U.S. currency. However, if any check or other instrument received by Lender as payment under the Note or this

-6(NJ) (0005)   Page 2 of 15   Initials:   Form 3031 1/01

Security Instrument is returned to Lender unpaid, Lender may require that any or all subsequent payments due under the Note and this Security Instrument be made in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality, or entity; or (d) Electronic Funds Transfer.

Payments are deemed received by Lender when received at the location designated in the Note or at such other location as may be designated by Lender in accordance with the notice provisions in Section 15. Lender may return any payment or partial payment if the payment or partial payments are insufficient to bring the Loan current. Lender may accept any payment or partial payment insufficient to bring the Loan current, without waiver of any rights hereunder or prejudice to its rights to refuse such payment or partial payments in the future. If Lender accepts such payments, it shall apply such payments at the time such payments are accepted. No offset or claim which Borrower might have now or in the future against Lender shall relieve Borrower from making payments due under the Note and this Security Instrument or performing the covenants and agreements secured by this Security Instrument.

2. **Application of Payments or Proceeds.** Except as otherwise described in this Section 2, all payments accepted and applied by Lender shall be applied in the following order of priority: (a) interest due under the Note; (b) principal due under the Note; (c) amounts due under Section 3. Such payments shall be applied to each Periodic Payment in the order in which it became due. Any remaining amounts shall be applied first to late charges, second to any other amounts due under this Security Instrument, and then to reduce the principal balance of the Note.

If Lender receives a payment from Borrower for a delinquent Periodic Payment which includes a sufficient amount to pay any late charge due, the payment may be applied to the delinquent payment and the late charge. If more than one Periodic Payment is outstanding, Lender may apply any payment received from Borrower to the repayment of the Periodic Payments if, and to the extent that, each payment can be paid in full. To the extent that any excess exists after the payment is applied to the full payment of one or more Periodic Payments, such excess may be applied to any late charges due. Voluntary prepayments shall be applied first to any prepayment charges and then as described in the Note.

Any application of payments, insurance proceeds, or Miscellaneous Proceeds to principal due under the Note shall not extend or postpone the due date, or change the amount, of the Periodic Payments.

3. **Funds for Escrow Items.** Borrower shall pay to Lender on the day Periodic Payments are due under the Note, until the Note is paid in full, a sum (the "Funds") to provide for payment of amounts due for: (a) taxes and assessments and other items which can attain priority over this Security Instrument as a lien or encumbrance on the Property; (b) leasehold payments or ground rents on the Property, if any; (c) premiums for any and all insurance required by Lender under Section 5; and (d) Mortgage Insurance premiums, if any, or any sums payable by Borrower to Lender in lieu of the payment of Mortgage Insurance premiums in accordance with the provisions of Section 10. These items are called "Escrow Items." At origination or at any time during the term of the Loan, Lender may require that Community Association Dues, Fees, and Assessments, if any, be escrowed by Borrower, and such dues, fees and assessments shall be an Escrow Item. Borrower shall promptly furnish to Lender all notices of amounts to be paid under this Section. Borrower shall pay Lender the Funds for Escrow Items unless Lender waives Borrower's obligation to pay the Funds for any or all Escrow Items. Lender may waive Borrower's obligation to pay to Lender Funds for any or all Escrow Items at any time. Any such waiver may only be in writing. In the event of such waiver, Borrower shall pay directly, when and where payable, the amounts

due for any Escrow Items for which payment of Funds has been waived by Lender and, if Lender requires, shall furnish to Lender receipts evidencing such payment within such time period as Lender may require. Borrower's obligation to make such payments and to provide receipts shall for all purposes be deemed to be a covenant and agreement contained in this Security Instrument, as the phrase "covenant and agreement" is used in Section 9. If Borrower is obligated to pay Escrow Items directly, pursuant to a waiver, and Borrower fails to pay the amount due for an Escrow Item, Lender may exercise its rights under Section 9 and pay such amount and Borrower shall then be obligated under Section 9 to repay to Lender any such amount. Lender may revoke the waiver as to any or all Escrow Items at any time by a notice given in accordance with Section 15 and, upon such revocation, Borrower shall pay to Lender all Funds, and in such amounts, that are then required under this Section 3.

Lender may, at any time, collect and hold Funds in an amount (a) sufficient to permit Lender to apply the Funds at the time specified under RESPA, and (b) not to exceed the maximum amount a lender can require under RESPA. Lender shall estimate the amount of Funds due on the basis of current data and reasonable estimates of expenditures of future Escrow Items or otherwise in accordance with Applicable Law.

The Funds shall be held in an institution whose deposits are insured by a federal agency, instrumentality, or entity (including Lender, if Lender is an institution whose deposits are so insured) or in any Federal Home Loan Bank. Lender shall apply the Funds to pay the Escrow Items no later than the time specified under RESPA. Lender shall not charge Borrower for holding and applying the Funds, annually analyzing the escrow account, or verifying the Escrow Items, unless Lender pays Borrower interest on the Funds and Applicable Law permits Lender to make such a charge. Unless an agreement is made in writing or Applicable Law requires interest to be paid on the Funds, Lender shall not be required to pay Borrower any interest or earnings on the Funds. Borrower and Lender can agree in writing, however, that interest shall be paid on the Funds. Lender shall give to Borrower, without charge, an annual accounting of the Funds as required by RESPA.

If there is a surplus of Funds held in escrow, as defined under RESPA, Lender shall account to Borrower for the excess funds in accordance with RESPA. If there is a shortage of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the shortage in accordance with RESPA, but in no more than 12 monthly payments. If there is a deficiency of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the deficiency in accordance with RESPA, but in no more than 12 monthly payments.

Upon payment in full of all sums secured by this Security Instrument, Lender shall promptly refund to Borrower any Funds held by Lender.

4. Charges; Liens. Borrower shall pay all taxes, assessments, charges, fines, and impositions attributable to the Property which can attain priority over this Security Instrument, leasehold payments or ground rents on the Property, if any, and Community Association Dues, Fees, and Assessments, if any. To the extent that these items are Escrow Items, Borrower shall pay them in the manner provided in Section 3.

Borrower shall promptly discharge any lien which has priority over this Security Instrument unless Borrower: (a) agrees in writing to the payment of the obligation secured by the lien in a manner acceptable to Lender, but only so long as Borrower is performing such agreement; (b) contests the lien in good faith by, or defends against enforcement of the lien in, legal proceedings which in Lender's opinion operate to prevent the enforcement of the lien while those proceedings are pending, but only until such proceedings are concluded; or (c) secures from the holder of the lien an agreement satisfactory to Lender subordinating the lien to this Security Instrument. If Lender determines that any part of the Property is subject to a lien which can attain priority over this Security Instrument, Lender may give Borrower a notice identifying the

lien. Within 10 days of the date on which that notice is given, Borrower shall satisfy the lien or take one or more of the actions set forth above in this Section 4.

Lender may require Borrower to pay a one-time charge for a real estate tax verification and/or reporting service used by Lender in connection with this Loan.

5. **Property Insurance.** Borrower shall keep the improvements now existing or hereafter erected on the Property insured against loss by fire, hazards included within the term "extended coverage," and any other hazards including, but not limited to, earthquakes and floods, for which Lender requires insurance. This insurance shall be maintained in the amounts (including deductible levels) and for the periods that Lender requires. What Lender requires pursuant to the preceding sentences can change during the term of the Loan. The insurance carrier providing the insurance shall be chosen by Borrower subject to Lender's right to disapprove Borrower's choice, which right shall not be exercised unreasonably. Lender may require Borrower to pay, in connection with this Loan, either: (a) a one-time charge for flood zone determination, certification and tracking services; or (b) a one-time charge for flood zone determination and certification services and subsequent charges each time remappings or similar changes occur which reasonably might affect such determination or certification. Borrower shall also be responsible for the payment of any fees imposed by the Federal Emergency Management Agency in connection with the review of any flood zone determination resulting from an objection by Borrower.

If Borrower fails to maintain any of the coverages described above, Lender may obtain insurance coverage, at Lender's option and Borrower's expense. Lender is under no obligation to purchase any particular type or amount of coverage. Therefore, such coverage shall cover Lender, but might or might not protect Borrower, Borrower's equity in the Property, or the contents of the Property, against any risk, hazard or liability and might provide greater or lesser coverage than was previously in effect. Borrower acknowledges that the cost of the insurance coverage so obtained might significantly exceed the cost of insurance that Borrower could have obtained. Any amounts disbursed by Lender under this Section 5 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

All insurance policies required by Lender and renewals of such policies shall be subject to Lender's right to disapprove such policies, shall include a standard mortgage clause, and shall name Lender as mortgagee and/or as an additional loss payee. Lender shall have the right to hold the policies and renewal certificates. If Lender requires, Borrower shall promptly give to Lender all receipts of paid premiums and renewal notices. If Borrower obtains any form of insurance coverage, not otherwise required by Lender, for damage to, or destruction of, the Property, such policy shall include a standard mortgage clause and shall name Lender as mortgagee and/or as an additional loss payee.

In the event of loss, Borrower shall give prompt notice to the insurance carrier and Lender. Lender may make proof of loss if not made promptly by Borrower. Unless Lender and Borrower otherwise agree in writing, any insurance proceeds, whether or not the underlying insurance was required by Lender, shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such insurance proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such insurance proceeds, Lender shall not be required to pay Borrower any interest or earnings on such proceeds. Fees for public adjusters, or other third parties, retained by Borrower shall not be paid out of the insurance proceeds and shall be the sole obligation of Borrower. If the restoration or repair is not economically feasible or Lender's security would be lessened, the insurance proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with

the excess, if any, paid to Borrower. Such insurance proceeds shall be applied in the order provided for in Section 2.

If Borrower abandons the Property, Lender may file, negotiate and settle any available insurance claim and related matters. If Borrower does not respond within 30 days to a notice from Lender that the insurance carrier has offered to settle a claim, then Lender may negotiate and settle the claim. The 30-day period will begin when the notice is given. In either event, or if Lender acquires the Property under Section 22 or otherwise, Borrower hereby assigns to Lender (a) Borrower's rights to any insurance proceeds in an amount not to exceed the amounts unpaid under the Note or this Security Instrument, and (b) any other of Borrower's rights (other than the right to any refund of unearned premiums paid by Borrower) under all insurance policies covering the Property, insofar as such rights are applicable to the coverage of the Property. Lender may use the insurance proceeds either to repair or restore the Property or to pay amounts unpaid under the Note or this Security Instrument, whether or not then due.

6. **Occupancy.** Borrower shall occupy, establish, and use the Property as Borrower's principal residence within 60 days after the execution of this Security Instrument and shall continue to occupy the Property as Borrower's principal residence for at least one year after the date of occupancy, unless Lender otherwise agrees in writing, which consent shall not be unreasonably withheld, or unless extenuating circumstances exist which are beyond Borrower's control.

7. **Preservation, Maintenance and Protection of the Property; Inspections.** Borrower shall not destroy, damage or impair the Property, allow the Property to deteriorate or commit waste on the Property. Whether or not Borrower is residing in the Property, Borrower shall maintain the Property in order to prevent the Property from deteriorating or decreasing in value due to its condition. Unless it is determined pursuant to Section 5 that repair or restoration is not economically feasible, Borrower shall promptly repair the Property if damaged to avoid further deterioration or damage. If insurance or condemnation proceeds are paid in connection with damage to, or the taking of, the Property, Borrower shall be responsible for repairing or restoring the Property only if Lender has released proceeds for such purposes. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. If the insurance or condemnation proceeds are not sufficient to repair or restore the Property, Borrower is not relieved of Borrower's obligation for the completion of such repair or restoration.

Lender or its agent may make reasonable entries upon and inspections of the Property. If it has reasonable cause, Lender may inspect the interior of the improvements on the Property. Lender shall give Borrower notice at the time of or prior to such an interior inspection specifying such reasonable cause.

8. **Borrower's Loan Application.** Borrower shall be in default if, during the Loan application process, Borrower or any persons or entities acting at the direction of Borrower or with Borrower's knowledge or consent gave materially false, misleading, or inaccurate information or statements to Lender (or failed to provide Lender with material information) in connection with the Loan. Material representations include, but are not limited to, representations concerning Borrower's occupancy of the Property as Borrower's principal residence.

9. **Protection of Lender's Interest in the Property and Rights Under this Security Instrument.** If (a) Borrower fails to perform the covenants and agreements contained in this Security Instrument, (b) there is a legal proceeding that might significantly affect Lender's interest in the Property and/or rights under this Security Instrument (such as a proceeding in bankruptcy, probate, for condemnation or forfeiture, for enforcement of a lien which may attain priority over this Security Instrument or to enforce laws or regulations), or (c) Borrower has abandoned the Property, then Lender may do and pay for whatever is reasonable or appropriate to protect Lender's interest in the Property and rights under this Security Instrument, including protecting and/or assessing the value of the Property, and securing and/or repairing the Property. Lender's actions can include, but are not limited to: (a) paying any sums secured by a lien which has priority over this Security Instrument; (b) appearing in court; and (c) paying reasonable

-6(NJ) (0005)                Page 7 of 15                Form 3031 1/01

attorneys' fees to protect its interest in the Property and/or rights under this Security Instrument, including its secured position in a bankruptcy proceeding. Securing the Property includes, but is not limited to, entering the Property to make repairs, change locks, replace or board up doors and windows, drain water from pipes, eliminate building or other code violations or dangerous conditions, and have utilities turned on or off. Although Lender may take action under this Section 9, Lender does not have to do so and is not under any duty or obligation to do so. It is agreed that Lender incurs no liability for not taking any or all actions authorized under this Section 9.

Any amounts disbursed by Lender under this Section 9 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

If this Security Instrument is on a leasehold, Borrower shall comply with all the provisions of the lease. If Borrower acquires fee title to the Property, the leasehold and the fee title shall not merge unless Lender agrees to the merger in writing.

10. Mortgage Insurance. If Lender required Mortgage Insurance as a condition of making the Loan, Borrower shall pay the premiums required to maintain the Mortgage Insurance in effect. If, for any reason, the Mortgage Insurance coverage required by Lender ceases to be available from the mortgage insurer that previously provided such insurance and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to obtain coverage substantially equivalent to the Mortgage Insurance previously in effect, at a cost substantially equivalent to the cost to Borrower of the Mortgage Insurance previously in effect, from an alternate mortgage insurer selected by Lender. If substantially equivalent Mortgage Insurance coverage is not available, Borrower shall continue to pay to Lender the amount of the separately designated payments that were due when the insurance coverage ceased to be in effect. Lender will accept, use and retain these payments as a non-refundable loss reserve in lieu of Mortgage Insurance. Such loss reserve shall be non-refundable, notwithstanding the fact that the Loan is ultimately paid in full, and Lender shall not be required to pay Borrower any interest or earnings on such loss reserve. Lender can no longer require loss reserve payments if Mortgage Insurance coverage (in the amount and for the period that Lender requires) provided by an insurer selected by Lender again becomes available, is obtained, and Lender requires separately designated payments toward the premiums for Mortgage Insurance. If Lender required Mortgage Insurance as a condition of making the Loan and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to maintain Mortgage Insurance in effect, or to provide a non-refundable loss reserve, until Lender's requirement for Mortgage Insurance ends in accordance with any written agreement between Borrower and Lender providing for such termination or until termination is required by Applicable Law. Nothing in this Section 10 affects Borrower's obligation to pay interest at the rate provided in the Note.

Mortgage Insurance reimburses Lender (or any entity that purchases the Note) for certain losses it may incur if Borrower does not repay the Loan as agreed. Borrower is not a party to the Mortgage Insurance.

Mortgage insurers evaluate their total risk on all such insurance in force from time to time, and may enter into agreements with other parties that share or modify their risk, or reduce losses. These agreements are on terms and conditions that are satisfactory to the mortgage insurer and the other party (or parties) to these agreements. These agreements may require the mortgage insurer to make payments using any source of funds that the mortgage insurer may have available (which may include funds obtained from Mortgage Insurance premiums).

As a result of these agreements, Lender, any purchaser of the Note, another insurer, any reinsurer, any other entity, or any affiliate of any of the foregoing, may receive (directly or indirectly) amounts that derive from (or might be characterized as) a portion of Borrower's payments for Mortgage Insurance, in exchange for sharing or modifying the mortgage insurer's risk, or reducing losses. If such agreement provides that an affiliate of Lender takes a share of the insurer's risk in exchange for a share of the premiums paid to the insurer, the arrangement is often termed "captive reinsurance." Further:

(a) Any such agreements will not affect the amounts that Borrower has agreed to pay for Mortgage Insurance, or any other terms of the Loan. Such agreements will not increase the amount Borrower will owe for Mortgage Insurance, and they will not entitle Borrower to any refund.

(b) Any such agreements will not affect the rights Borrower has - if any - with respect to the Mortgage Insurance under the Homeowners Protection Act of 1998 or any other law. These rights may include the right to receive certain disclosures, to request and obtain cancellation of the Mortgage Insurance, to have the Mortgage Insurance terminated automatically, and/or to receive a refund of any Mortgage Insurance premiums that were unearned at the time of such cancellation or termination.

11. Assignment of Miscellaneous Proceeds; Forfeiture. All Miscellaneous Proceeds are hereby assigned to and shall be paid to Lender.

If the Property is damaged, such Miscellaneous Proceeds shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such Miscellaneous Proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may pay for the repairs and restoration in a single disbursement or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such Miscellaneous Proceeds, Lender shall not be required to pay Borrower any interest or earnings on such Miscellaneous Proceeds. If the restoration or repair is not economically feasible or Lender's security would be lessened, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower. Such Miscellaneous Proceeds shall be applied in the order provided for in Section 2.

In the event of a total taking, destruction, or loss in value of the Property, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is equal to or greater than the amount of the sums secured by this Security Instrument immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the sums secured by this Security Instrument shall be reduced by the amount of the Miscellaneous Proceeds multiplied by the following fraction: (a) the total amount of the sums secured immediately before the partial taking, destruction, or loss in value divided by (b) the fair market value of the Property immediately before the partial taking, destruction, or loss in value. Any balance shall be paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is less than the amount of the sums secured immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument whether or not the sums are then due.

If the Property is abandoned by Borrower, or if, after notice by Lender to Borrower that the Opposing Party (as defined in the next sentence) offers to make an award to settle a claim for damages, Borrower fails to respond to Lender within 30 days after the date the notice is given. Lender is authorized to collect and apply the Miscellaneous Proceeds either to restoration or repair of the Property or to the sums secured by this Security Instrument, whether or not then due. "Opposing Party" means the third party that owes Borrower Miscellaneous Proceeds or the party against whom Borrower has a right of action in regard to Miscellaneous Proceeds.

Borrower shall be in default if any action or proceeding, whether civil or criminal, is begun that, in Lender's judgment, could result in forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. Borrower can cure such a default and, if acceleration has occurred, reinstate as provided in Section 19, by causing the action or proceeding to be dismissed with a ruling that, in Lender's judgment, precludes forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. The proceeds of any award or claim for damages that are attributable to the impairment of Lender's interest in the Property are hereby assigned and shall be paid to Lender.

All Miscellaneous Proceeds that are not applied to restoration or repair of the Property shall be applied in the order provided for in Section 2.

**12. Borrower Not Released; Forbearance By Lender Not a Waiver.** Extension of the time for payment or modification of amortization of the sums secured by this Security Instrument granted by Lender to Borrower or any Successor in Interest of Borrower shall not operate to release the liability of Borrower or any Successors in Interest of Borrower. Lender shall not be required to commence proceedings against any Successor in Interest of Borrower or to refuse to extend time for payment or otherwise modify amortization of the sums secured by this Security Instrument by reason of any demand made by the original Borrower or any Successors in Interest of Borrower. Any forbearance by Lender in exercising any right or remedy including, without limitation, Lender's acceptance of payments from third persons, entities or Successors in Interest of Borrower or in amounts less than the amount then due, shall not be a waiver of or preclude the exercise of any right or remedy.

**13. Joint and Several Liability; Co-signers; Successors and Assigns Bound.** Borrower covenants and agrees that Borrower's obligations and liability shall be joint and several. However, any Borrower who co-signs this Security Instrument but does not execute the Note (a "co-signer"): (a) is co-signing this Security Instrument only to mortgage, grant and convey the co-signer's interest in the Property under the terms of this Security Instrument; (b) is not personally obligated to pay the sums secured by this Security Instrument; and (c) agrees that Lender and any other Borrower can agree to extend, modify, forbear or make any accommodations with regard to the terms of this Security Instrument or the Note without the co-signer's consent.

Subject to the provisions of Section 18, any Successor in Interest of Borrower who assumes Borrower's obligations under this Security Instrument in writing, and is approved by Lender, shall obtain all of Borrower's rights and benefits under this Security Instrument. Borrower shall not be released from Borrower's obligations and liability under this Security Instrument unless Lender agrees to such release in writing. The covenants and agreements of this Security Instrument shall bind (except as provided in Section 20) and benefit the successors and assigns of Lender.

**14. Loan Charges.** Lender may charge Borrower fees for services performed in connection with Borrower's default, for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument, including, but not limited to, attorneys' fees, property inspection and valuation fees. In regard to any other fees, the absence of express authority in this Security Instrument to charge a specific fee to Borrower shall not be construed as a prohibition on the charging of such fee. Lender may not charge fees that are expressly prohibited by this Security Instrument or by Applicable Law.

If the Loan is subject to a law which sets maximum loan charges, and that law is finally interpreted so that the interest or other loan charges collected or to be collected in connection with the Loan exceed the permitted limits, then: (a) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already collected from Borrower which exceeded permitted limits will be refunded to Borrower. Lender may choose to make this refund by reducing the principal owed under the Note or by making a direct payment to Borrower. If a refund reduces principal, the reduction will be treated as a partial prepayment without any prepayment charge (whether or not a prepayment charge is provided for under the Note). Borrower's acceptance of any such refund made by direct payment to Borrower will constitute a waiver of any right of action Borrower might have arising out of such overcharge.

**15. Notices.** All notices given by Borrower or Lender in connection with this Security Instrument must be in writing. Any notice to Borrower in connection with this Security Instrument shall be deemed to have been given to Borrower when mailed by first class mail or when actually delivered to Borrower's notice address if sent by other means. Notice to any one Borrower shall constitute notice to all Borrowers unless Applicable Law expressly requires otherwise. The notice address shall be the Property Address unless Borrower has designated a substitute notice address by notice to Lender. Borrower shall promptly notify Lender of Borrower's change of address. If Lender specifies a procedure for reporting Borrower's change of address, then Borrower shall only report a change of address through that specified procedure. There may be only one designated notice address under this Security Instrument at any one time. Any notice to Lender shall be given by delivering it or by mailing it by first class mail to Lender's address stated herein unless Lender has designated another address by notice to Borrower. Any notice in connection with this Security Instrument shall not be deemed to have been given to Lender until actually received by Lender. If any notice required by this Security Instrument is also required under Applicable Law, the Applicable Law requirement will satisfy the corresponding requirement under this Security Instrument.

**16. Governing Law; Severability; Rules of Construction.** This Security Instrument shall be governed by federal law and the law of the jurisdiction in which the Property is located. All rights and obligations contained in this Security Instrument are subject to any requirements and limitations of Applicable Law. Applicable Law might explicitly or implicitly allow the parties to agree by contract or it might be silent, but such silence shall not be construed as a prohibition against agreement by contract. In the event that any provision or clause of this Security Instrument or the Note conflicts with Applicable Law, such conflict shall not affect other provisions of this Security Instrument or the Note which can be given effect without the conflicting provision.

As used in this Security Instrument: (a) words of the masculine gender shall mean and include corresponding neuter words or words of the feminine gender; (b) words in the singular shall mean and include the plural and vice versa; and (c) the word "may" gives sole discretion without any obligation to take any action.

**17. Borrower's Copy.** Borrower shall be given one copy of the Note and of this Security Instrument.

**18. Transfer of the Property or a Beneficial Interest in Borrower.** As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law.

If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

**19. Borrower's Right to Reinstate After Acceleration.** If Borrower meets certain conditions, Borrower shall have the right to have enforcement of this Security Instrument discontinued at any time prior to the earliest of: (a) five days before sale of the Property pursuant to any power of sale contained in this Security Instrument; (b) such other period as Applicable Law might specify for the termination of Borrower's right to reinstate; or (c) entry of a judgment enforcing this Security Instrument. Those conditions are that Borrower: (a) pays Lender all sums which then would be due under this Security Instrument and the Note as if no acceleration had occurred; (b) cures any default of any other covenants or agreements; (c) pays all expenses incurred in enforcing this Security Instrument, including, but not limited to, reasonable attorneys' fees, property inspection and valuation fees, and other fees incurred for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument; and (d) takes such action as Lender may reasonably require to assure that Lender's interest in the Property and rights under this Security Instrument, and Borrower's obligation to pay the sums secured by this Security Instrument, shall continue unchanged. Lender may require that Borrower pay such reinstatement sums and expenses in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality or entity; or (d) Electronic Funds Transfer. Upon reinstatement by Borrower, this Security Instrument and obligations secured hereby shall remain fully effective as if no acceleration had occurred. However, this right to reinstate shall not apply in the case of acceleration under Section 18.

**20. Sale of Note; Change of Loan Servicer; Notice of Grievance.** The Note or a partial interest in the Note (together with this Security Instrument) can be sold one or more times without prior notice to Borrower. A sale might result in a change in the entity (known as the "Loan Servicer") that collects Periodic Payments due under the Note and this Security Instrument and performs other mortgage loan servicing obligations under the Note, this Security Instrument, and Applicable Law. There also might be one or more changes of the Loan Servicer unrelated to a sale of the Note. If there is a change of the Loan Servicer, Borrower will be given written notice of the change which will state the name and address of the

new Loan Servicer, the address to which payments should be made and any other information RESPA requires in connection with a notice of transfer of servicing. If the Note is sold and thereafter the Loan is serviced by a Loan Servicer other than the purchaser of the Note, the mortgage loan servicing obligations to Borrower will remain with the Loan Servicer or be transferred to a successor Loan Servicer and are not assumed by the Note purchaser unless otherwise provided by the Note purchaser.

Neither Borrower nor Lender may commence, join, or be joined to any judicial action (as either an individual litigant or the member of a class) that arises from the other party's actions pursuant to this Security Instrument or that alleges that the other party has breached any provision of, or any duty owed by reason of, this Security Instrument, until such Borrower or Lender has notified the other party (with such notice given in compliance with the requirements of Section 15) of such alleged breach and afforded the other party hereto a reasonable period after the giving of such notice to take corrective action. If Applicable Law provides a time period which must elapse before certain action can be taken, that time period will be deemed to be reasonable for purposes of this paragraph. The notice of acceleration and opportunity to cure given to Borrower pursuant to Section 22 and the notice of acceleration given to Borrower pursuant to Section 18 shall be deemed to satisfy the notice and opportunity to take corrective action provisions of this Section 20.

21. **Hazardous Substances.** As used in this Section 21: (a) "Hazardous Substances" are those substances defined as toxic or hazardous substances, pollutants, or wastes by Environmental Law and the following substances: gasoline, kerosene, other flammable or toxic petroleum products, toxic pesticides and herbicides, volatile solvents, materials containing asbestos or formaldehyde, and radioactive materials; (b) "Environmental Law" means federal laws and laws of the jurisdiction where the Property is located that relate to health, safety or environmental protection; (c) "Environmental Cleanup" includes any response action, remedial action, or removal action, as defined in Environmental Law; and (d) an "Environmental Condition" means a condition that can cause, contribute to, or otherwise trigger an Environmental Cleanup.

Borrower shall not cause or permit the presence, use, disposal, storage, or release of any Hazardous Substances, or threaten to release any Hazardous Substances, on or in the Property. Borrower shall not do, nor allow anyone else to do, anything affecting the Property (a) that is in violation of any Environmental Law, (b) which creates an Environmental Condition, or (c) which, due to the presence, use, or release of a Hazardous Substance, creates a condition that adversely affects the value of the Property. The preceding two sentences shall not apply to the presence, use, or storage on the Property of small quantities of Hazardous Substances that are generally recognized to be appropriate to normal residential uses and to maintenance of the Property (including, but not limited to, hazardous substances in consumer products).

Borrower shall promptly give Lender written notice of (a) any investigation, claim, demand, lawsuit or other action by any governmental or regulatory agency or private party involving the Property and any Hazardous Substance or Environmental Law of which Borrower has actual knowledge, (b) any Environmental Condition, including but not limited to, any spilling, leaking, discharge, release or threat of release of any Hazardous Substance, and (c) any condition caused by the presence, use or release of a Hazardous Substance which adversely affects the value of the Property. If Borrower learns, or is notified by any governmental or regulatory authority, or any private party, that any removal or other remediation of any Hazardous Substance affecting the Property is necessary, Borrower shall promptly take all necessary remedial actions in accordance with Environmental Law. Nothing herein shall create any obligation on Lender for an Environmental Cleanup.

NON-UNIFORM COVENANTS. Borrower and Lender further covenant and agree as follows:

22. Acceleration; Remedies. Lender shall give notice to Borrower prior to acceleration following Borrower's breach of any covenant or agreement in this Security Instrument (but not prior to acceleration under Section 18 unless Applicable Law provides otherwise). The notice shall specify: (a) the default; (b) the action required to cure the default; (c) a date, not less than 30 days from the date the notice is given to Borrower, by which the default must be cured; (d) that failure to cure the default on or before the date specified in the notice may result in acceleration of the sums secured by this Security Instrument, foreclosure by judicial proceeding and sale of the Property; (e) the Borrower's right to reinstate after acceleration and the right to assert in the foreclosure proceeding the non-existence of a default or any other defense of Borrower to acceleration and foreclosure; and (f) any other disclosure required under the Fair Foreclosure Act, codified at Sections 2A:50-53 et seq. of the New Jersey Statutes, or other Applicable Law. If the default is not cured on or before the date specified in the notice, Lender at its option may require immediate payment in full of all sums secured by this Security Instrument without further demand and may foreclose this Security Instrument by judicial proceeding. Lender shall be entitled to collect all expenses incurred in pursuing the remedies provided in this Section 22, including, but not limited to, attorneys' fees and costs of title evidence permitted by Rules of Court.

23. Release. Upon payment of all sums secured by this Security Instrument, Lender shall cancel this Security Instrument. Borrower shall pay any recordation costs. Lender may charge Borrower a fee for releasing this Security Instrument, but only if the fee is paid to a third party for services rendered and the charging of the fee is permitted under Applicable Law.

24. No Claim of Credit for Taxes. Borrower will not make deduction from or claim credit on the principal or interest secured by this Security Instrument by reason of any governmental taxes, assessments or charges. Borrower will not claim any deduction from the taxable value of the Property by reason of this Security Instrument.

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this Security Instrument and in any Rider executed by Borrower and recorded with it.

Signed, sealed and delivered in the presence of:

_____        _Claire E Fisher_____ (Seal)
                                         Claire E Fisher              -Borrower

_____        _Robert E Fisher_____ (Seal)
                                         Robert E Fisher              -Borrower

_____ (Seal)            _____ (Seal)
              -Borrower                                -Borrower

_____ (Seal)            _____ (Seal)
              -Borrower                                -Borrower

_____ (Seal)            _____ (Seal)
              -Borrower                                -Borrower

969

STATE OF NEW JERSEY,       *Gloucester*       County ss:

On this 25TH       day of March,  2004       , before me, the subscriber,
personally appeared **Claire E Fisher   and Robert E Fisher**

who, I am satisfied,
is/are the person(s) named in and who executed the within instrument, and thereupon acknowledged that
he/she/they signed, sealed and delivered the same as his/her/their act and deed, for the purposes therein
expressed.

Notary Public

PATRICK D. HINDMAN
FOREIGN COMMISSIONER OF DEEDS
STATE OF NEW JERSEY
Commission Expires May 29, 2006

-6G(NJ) (0005)

969

Page 15 of 15

Initials:

Form 3031 1/01

969

# ADJUSTABLE RATE RIDER
### (LIBOR Index - Rate Caps)

THIS ADJUSTABLE RATE RIDER is made this 25TH                          day of March,  2004
                                    , and is incorporated into and shall be deemed to amend and supplement
the Mortgage, Deed of Trust or Security Deed (the "Security Instrument") of the same date given by the
undersigned (the "Borrower") to secure Borrower's Adjustable Rate Note (the "Note") to
Chase Manhattan Mortgage Corp.
                                                                (the "Lender")

a corporation organized and existing under the laws of New Jersey
of the same date and covering the property described in the Security Instrument and located at:
1170 Lewis Ter
West Deptford Twp. New Jersey  08096
                    (Property Address)

THE NOTE CONTAINS PROVISIONS ALLOWING FOR CHANGES IN THE INTEREST RATE
AND THE MONTHLY PAYMENT. THE NOTE LIMITS THE AMOUNT THE BORROWER'S
INTEREST RATE CAN CHANGE AT ANY ONE TIME AND THE MAXIMUM RATE THE
BORROWER MUST PAY.

ADDITIONAL COVENANTS. In addition to the covenants and agreements made in the Security
Instrument, Borrower and Lender further covenant and agree as follows:
A. INTEREST RATE AND MONTHLY PAYMENT CHANGES
The Note provides for an initial interest rate of  Six  and  875/1000
6.875                                                                        %.

MULTISTATE LIBOR ARM RIDER
BC-6733.LT (1/01) Page 1 of 3 (replaces 2/00)

The Note provides for changes in the interest rate and the monthly payments, as follows:

**4. INTEREST RATE AND MONTHLY PAYMENT CHANGES**

(A) Change Dates

The interest rate I will pay may change on the 1ST       day of April, 2006       and on that day every sixth month thereafter. Each date on which my interest rate could change is called "Change Date".

(B) The Index

Beginning with the first Change Date, my interest rate will be based on an Index. The "Index" is the average of interbank offered rates for six month U.S. dollar-denominated deposits in the London market ("LIBOR"), as published in *The Wall Street Journal*. The most recent Index figure available as of the date 45 days before each Change Date is called the "Current Index".

If the Index is no longer available, the Note Holder will choose a new index which is based upon comparable information. The Note Holder will give me notice of this choice.

(C) Calculation of Changes

Before each Change Date, the Note Holder will calculate my new interest rate by adding Three and 500/1000       percentage points (3.500       %) to the Current Index. The Note Holder will then round the result of this addition to the nearest one-eighth of one percentage point (0.125%). Subject to the limits stated in Section 4(D) below, this rounded amount will be my new interest rate until the next Change Date.

The Note Holder will then determine the amount of the monthly payment that would be sufficient to repay the unpaid principal that I am expected to owe at the Change Date in full on the Maturity Date at my new interest rate in substantially equal payments. The result of this calculation will be the new amount of my monthly payment.

(D) Limits on Interest Rate Changes

The interest rate I am required to pay at the first Change Date will not be greater than 9.875       or less than 6.875                                                                 %

Thereafter, my interest rate will never be increased or decreased on any single Change Date by more than one and a half percentage points (1.5%) from the rate of interest I have been paying for the preceding six months. My interest rate will never be greater than 13.875

and will never be lower than 6.875                                                         %
                                                                                        %.

MULTISTATE LIBOR ARM RIDER
BC-6733.LT (1/01) Page 2 of 3 (replaces 2/00)

**(E)  Effective Date of Changes**

My new interest rate will become effective on each Change Date. I will pay the amount of my new monthly payment beginning on the first monthly payment after the Change Date until the amount of my monthly payment changes again.

**(F)  Notice of Changes**

The Note Holder will deliver or mail to me a notice of any changes in my interest rate and the amount of my monthly payment before the effective date of any change. The notice will include information required by law to be given to me and also the title and telephone number of a person who will answer any question I may have regarding the notice.

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this Adjustable Rate Rider.

_Claire E. Fisher_  
Borrower Claire E Fisher                    Date

_Robert E. Fish_    3-25-04  
Borrower Robert E Fisher                    Date

_____    _____  
Borrower                    Date

_____    _____  
Borrower                    Date

_____    _____  
Borrower                    Date

_____    _____  
Borrower                    Date

_____    _____  
Borrower                    Date

_____    _____  
Borrower                    Date

MULTISTATE LIBOR ARM RIDER  
BC-6733.LT  (1/01) Page 3 of 3 (replaces 2/00)

File No. PHI364932

Appendix A

BEGINNING AT A POINT IN THE SOUTHEASTERLY LINE OF LEWIS TERRACE (50 FEET WIDE) A TOTAL DISTANCE OF 299.45 FEET MEASURED NORTHEASTWARDLY ALONG THE TANGENT AND CURVED SOUTHEASTERLY LINES OF LEWIS TERRACE FROM A POINT MARKING THE NORTHEASTERLY END OF THE CURVED EASTERLY CORNER OF LEWIS TERRACE AND FORD AVENUE (50 FEET WIDE) SAID CORNER HAVING A RADIUS OF 25 FEET SAID BEGINNING POINT BEING IN THE DIVISION LINE BETWEEN LOTS 14 AND 15, PLAN HEREINAFTER MENTIONED; THENCE

(1) NORTH 22 DEGREES 17 MINUTES 30 SECONDS EAST ALONG THE SOUTHEASTERLY LINE OF LEWIS TERRACE 64 FEET TO A POINT IN DIVISION LINE BETWEEN LOTS 15 AND 16 SAID PLAN; THENCE

(2) SOUTH 67 DEGREES 42 MINUTES 30 SECONDS EAST ALONG LAST MENTIONED DIVISION LINE 118.13 FEET TO A POINT IN REAR LINE OF LOT 5 SAID PLAN; THENCE

(3) SOUTH 24 DEGREES 39 MINUTES 10 SECONDS WEST ALONG DIVISION LINE BETWEEN LOT 15 AND PART OF LOTS 5 AND 6, SAID PLAN, 64.06 FEET TO A POINT IN DIVISION LINE BETWEEN LOTS 14 AND 15 AFORESAID; THENCE

(4) NORTH 67 DEGREES 42 MINUTES 30 SECONDS WEST ALONG LAST MENTIONED DIVISION LINE 115.49 FEET TO A POINT IN THE SOUTHEASTERLY LINE OF LEWIS TERRACE AND PLACE OF BEGINNING.

BEING LOT 15, BLOCK 132 A, PLAN OF HARKER VILLAGE MADE BY WILLIAM A. E. CONOVER, PROFESSIONAL ENGINEER AND LAND SURVEYOR, DATED APRIL, 1955, FILED.

COMMONLY KNOWN AS: 1170 LEWIS TERRACE WEST DEPFORD TOWNSHIP, NEW JERSEY 08096

LOT 15 BLOCK 132.01

BEING THE SAME PROPERTY CONVEYED TO ROBERT E. FISHER AND CLAIRE E. FISHER, BY DEED DATED APRIL 30, 1998, FROM MARGARET M. WOLF, EXECUTRIX OF THE ESTATE OF DONALD THOMAS MEAGHER, DECEASED, OF RECORD IN BOOK 2872 PAGE 230, OFFICE OF THE GLOUCESTER COURT CLERK.

| Gloucester County Recording Data Page<br>Honorable James N. Hogan<br>Gloucester County Clerk | Official Use Only – Barcode |
|---|---|
| | Docket: 00045992<br>Type:LPF  Pages:<br>James N. Hogan, Gloucester County Clerk<br>Receipt:702187  01:18:54P  Nov 20,2017<br>Recording Fee:  40.00 |

| Official Use Only – Record & Return | Official Use Only – Realty Transfer Fee |
|---|---|
| | |

| Date of Document:<br>11/16/2017 | Type of Document:<br>LIS PENDENS FORECLOSURE |
|---|---|

| First Party Name:<br>FISHER, CLAIRE E. | Second Party Name:<br>JPMORGAN CHASE BANK, NATIONAL ASSOCIATION |
|---|---|

Additional Parties:
FISHER, ROBERT E., STEWARD FINANCIAL SERVICES LLC, NEW CENTURY FINANCIAL SERVICES, BURLINGTON COUNTY BOARD OF SOCIAL SERVICES, GRAVES, CORINNE C., DAVIS, EILEEN, SWANSON, KIMBERLY D., STATE OF NEW JERSEY

| THE FOLLOWING SECTION IS REQUIRED FOR DEEDS ONLY ||
|---|---|
| Block: | Lot: |
| Municipality: ||
| Consideration: ||
| Mailing Address of Grantee: ||

| THE FOLLOWING SECTION IS FOR ORIGINAL MORTGAGE BOOKING & PAGING INFORMATION FOR<br>ASSIGNMENTS, RELEASES, SATISFACTIONS, DISCHARGES & OTHER ORIGINAL MORTGAGE AGREEMENTS ONLY ||
|---|---|
| Original Book:<br>7519 | Original Page:<br>34 |

| GLOUCESTER COUNTY RECORDING DATA PAGE |
|---|
| Please do not detach this page from the original document as it<br>contains important recording information and is part of the permanent record. |

800105
**PHELAN HALLINAN DIAMOND & JONES, PC**
James DiMaggio, Esq. ID No. 044492011
400 Fellowship Road Suite 100
Mt. Laurel, NJ 08054
856-813-5500
Attorney for Plaintiff

| | |
|---|---|
| JPMORGAN CHASE BANK, NATIONAL ASSOCIATION<br>     PLAINTIFF<br><br>Vs.<br><br>CLAIRE E. FISHER;<br>MR. FISHER, HUSBAND OF CLAIRE E. FISHER;<br>ROBERT E. FISHER;<br>MRS. ROBERT E. FISHER, HIS WIFE;<br>STEWARD FINANCIAL SERVICES LLC;<br>NEW CENTURY FINANCIAL SERVICES;<br>BURLINGTON COUNTY BOARD OF SOCIAL SERVICES;<br>CORINNE C. GRAVES;<br>EILEEN DAVIS;<br>KIMBERLY D. SWANSON;<br>STATE OF NEW JERSEY<br>     DEFENDANT(S) | SUPERIOR COURT OF NEW JERSEY<br>CHANCERY DIVISION<br>GLOUCESTER COUNTY<br>DOCKET NO: F-025753-17<br><br><br>CIVIL ACTION<br>NOTICE OF LIS PENDENS |

TO WHOM IT MAY CONCERN

Notice is hereby given of the commencement and pendency of the above-entitled Civil Action, the general objects of which are:

1.     To foreclose the following mortgage covering the premises hereinafter described, to wit:

Mortgage made by CLAIRE E. FISHER and ROBERT E. FISHER and given to CHASE MANHATTAN MORTGAGE CORP. dated March 25, 2004 and recorded April 19, 2004 in the Office of the GLOUCESTER County Clerk in Book 7519, Page 34. Said mortgage was subsequently assigned to Plaintiff herein.

2.     To recover possession of the lands and premises hereinafter described.

The land and premises to be affected by said suit are described in Exhibit "A" annexed hereto.

3.     The Foreclosure Complaint in the above-entitled action was filed in the Office of the Clerk of the Superior Court of New Jersey on November 14, 2017.

Date: November 16, 2017

PHELAN HALLINAN DIAMOND & JONES, PC

By: _____
James DiMaggio, Esq.
Attorney for Plaintiff

All that certain tract, lot and parcel of land lying and being in the Township of West Deptford, County of Gloucester, State of New Jersey being more particularly described as follows:

BEGINNING AT A POINT IN THE SOUTHEASTERLY LINE OF LEWIS TERRACE (50 FEET WIDE) A TOTAL DISTANCE OF 299.45 FEET MEASURED NORTHEASTWARDLY ALONG THE TANGENT AND CURVED SOUTHEASTERLY LINES OF LEWIS TERRACE FROM A POINT MARKING THE NORTHEASTERLY END OF THE CURVED EASTERLY CORNER OF LEWIS TERRACE AND FORD AVENUE (50 FEET WIDE) SAID CORNER HAVING A RADIUS OF 25 FEET SAID BEGINNING POINT BEING IN THE DIVISION LINE BETWEEN LOTS 14 AND 15, PLAN HEREINAFTER MENTIONED; THENCE

(1) NORTH 22 DEGREES 17 MINUTES 30 SECONDS EAST ALONG THE SOUTHEASTERLY LINE OF LEWIS TERRACE 64 FEET TO A POINT IN DIVISION LINE BETWEEN LOTS 15 AND 16 SAID PLAN; THENCE

(2) SOUTH 67 DEGREES 42 MINUTES 30 SECONDS EAST ALONG LAST MENTIONED DIVISION LINE 118.13 FEET TO A POINT IN REAR LINE OF LOT 5 SAID PLAN; THENCE

(3) SOUTH 24 DEGREES 39 MINUTES 10 SECONDS WEST ALONG DIVISION LINE BETWEEN LOT 15 AND PART OF LOTS 5 AND 6. SAID PLAN, 64.06 FEET TO A POINT IN DIVISION LINE BETWEEN LOTS 14 AND 15 AFORESAID; THENCE

(4) NORTH 67 DEGREES 42 MINUTES 30 SECONDS WEST ALONG LAST MENTIONED DIVISION LINE 115.49 FEET TO A POINT IN THE SOUTHEASTERLY LINE OF LEWIS TERRACE AND PLACE OF BEGINNING.

BEING LOT 15, BLOCK 132 A, PLAN OF HARKER VILLAGE MADE BY WILLIAM A. E. CONOVER, PROFESSIONAL ENGINEER AND LAND SURVEYOR, DATED APRIL, 1955, FILED.

COMMONLY KNOWN AS: 1170 LEWIS TERRACE, WEST DEPTFORD TOWNSHIP, NEW JERSEY 08096

LOT 15 BLOCK 132.01

BEING THE SAME PROPERTY CONVEYED TO ROBERT E. FISHER AND CLAIRE E. FISHER, BY DEED DATED APRIL 30, 1998, FROM MARGARET M. WOLF, EXECUTRIX OF THE ESTATE OF DONALD THOMAS MEAGHER, DECEASED, OF RECORD IN BOOK 2872 PAGE 230, OFFICE OF THE GLOUCESTER COURT CLERK.

| Gloucester County Recording Data Page<br>Honorable James N. Hogan<br>Gloucester County Clerk | *Official Use Only – Barcode* |
|---|---|
| | *\*60 2017 00048675\** |
| | Docket: 00048675<br>Type:FTL    Pages:2<br>James N. Hogan, Gloucester County Clerk<br>Receipt:707847   02:20:14P   Dec 11,2017<br>Recording Fee:    25.00  FTL  BK   139   204 |
| *Official Use Only – Record & Return*<br><br>INTERNAL REVENUE SERVICE<br>STOP 8420G<br>PO BOX 145595<br>CINCINNATI OH  45250-9732 | *Official Use Only – Realty Transfer Fee* |
| Date of Document: | Type of Document: |
| First Party Name: | Second Party Name: |
| Additional Parties: | |

| THE FOLLOWING SECTION IS REQUIRED FOR DEEDS ONLY | |
|---|---|
| Block: | Lot: |
| Municipality: | |
| Consideration: | |
| Mailing Address of Grantee: | |

| THE FOLLOWING SECTION IS FOR ORIGINAL MORTGAGE BOOKING & PAGING INFORMATION FOR<br>ASSIGNMENTS, RELEASES, SATISFACTIONS, DISCHARGES & OTHER ORIGINAL MORTGAGE AGREEMENTS ONLY | |
|---|---|
| Original Book: | Original Page: |

| GLOUCESTER COUNTY RECORDING DATA PAGE |
|---|
| Please do not detach this page from the original document as it<br>contains important recording information and is part of the permanent record. |

5216

**Form 668 (Y)(c)**
(Rev. February 2004)

Department of the Treasury - Internal Revenue Service

## Notice of Federal Tax Lien

| Area: WAGE & INVESTMENT AREA #1 Lien Unit Phone: (800) 829-7650 | Serial Number 287936117 | For Optional Use by Recording Office |
|---|---|---|

As provided by section 6321, 6322, and 6323 of the Internal Revenue Code, we are giving a notice that taxes (including interest and penalties) have been assessed against the following-named taxpayer. We have made a demand for payment of this liability, but it remains unpaid. Therefore, there is a lien in favor of the United States on all property and rights to property belonging to this taxpayer for the amount of these taxes, and additional penalties, interest, and costs that may accrue.

Name of Taxpayer ROBERT FISHER JR

Residence      341 LYNN AVE
               WENONAH, NJ 08090-1040

**IMPORTANT RELEASE INFORMATION:** For each assessment listed below, unless notice of the lien is refiled by the date given in column (e), this notice shall, on the day following such date, operate as a certificate of release as defined in IRC 6325(a).

| Kind of Tax (a) | Tax Period Ending (b) | Identifying Number (c) | Date of Assessment (d) | Last Day for Refiling (e) | Unpaid Balance of Assessment (f) |
|---|---|---|---|---|---|
| 1040 | 12/31/2012 | XXX-XX-1632 | 05/18/2015 | 06/17/2025 | 9444.45 |
| 1040 | 12/31/2015 | XXX-XX-1632 | 06/06/2016 | 07/06/2026 | 6731.35 |

Place of Filing

Office of the County Clerk
GLOUCESTER
WOODBURY, NJ 08096

Total $     16175.80

This notice was prepared and signed at _____ DETROIT, MI _____ , on this,

the ____30th____ day of ___November___, ___2017___

| Signature _Joan Flach_ for LISA WILLIAMS | Title ACS W&I (800) 829-7650 | 11-00-0000 |
|---|---|---|

(NOTE: Certificate of officer authorized by law to take acknowledgment is not essential to the validity of Notice of Federal Tax lien Rev. Rul. 71-466, 1971 - 2 C.B. 409)

Part 1 - Kept By Recording Office

Form 668(Y)(c) (Rev. 2-2004)
CAT. NO 60025X